(9 Misc. Rep. 564.)

## In re O'ROURKE.

(Supreme Court, Special Term, Kings County. July, 1894.)

MUNICIPAL CORPORATIONS—ORDINANCES—PLACES OF PUBLIC AMUSEMENTS.

An ordinance which provides that keepers of places of public amusements "are hereby required to be licensed, and licenses shall be granted to them by the mayor," and that "the licenses required to be granted by the foregoing section shall be issued by the city clerk and signed by the mayor," is not an exercise of the power given by the city charter to prohibit places of public amusements, but is mandatory, and the mayor has no power to refuse a license.

Application by John H. O'Rourke for a mandamus to compel the mayor of the city of Brooklyn to license a certain building for public exhibits. Granted.

J. A. Wernberg, for petitioner.

A. E. Mudge, Asst. Corp. Counsel, opposed.

GAYNOR, J. Though no briefs were submitted, this case is by no means plain. The petitioner applied to the mayor of the city of Brooklyn to license a certain building in the Thirty-First ward (formerly the town of Gravesend) for the purpose of public exhibitions and contests in athletic games, including rowing, bicycling, club swinging, fencing, wrestling, boxing, and was refused. The

license applied for concededly comes under the head of "Places of Public Amusement," both in the charter and the ordinances of the city of Brooklyn. The charter act (chapter 583, Laws 1888, § 12, tit. 2) provides, in so many words, that the common council shall have power, within the said city, to make ordinances, not inconsistent with the laws and constitution of this state or of the United States, for certain enumerated purposes, one of them being this (subdivision 8): "To prohibit or regulate and license all places of public amusement." This language, "to prohibit or regulate and license," is broad; but the legislature did not intend thereby to confer power upon the common council to prohibit, or authorize the prohibition of, all places of public amusement. The true construction is that it meant to confer power to regulate and license places of public amusement, and, as incidental thereto, to curtail their number, to the extent of refusing licenses to places which, used for such a purpose, would interfere with the general welfare, peace, and order, and in this respect the legislature conferred an absolute discretion. The regulation and control of public amusements come within what we call the "police power" of the legislature, so closely do they concern social order; and it has been decided in this state that the legislature may confer upon the mayor of a city absolute discretion in the licensing of auctioneers or places of public amusement, in respect of the persons or places to be licensed. People v. Grant, 126 N. Y. 473, 27 N. E. 964; Id., 58 Hun, 455, 12 N. Y. Supp. 879; People v. Thatcher, 42 Hun, 349. It being, therefore, true that the legislature did, by the provision already cited, validly confer upon the common council of Brooklyn the power to pass ordinances to regulate and license, and in so doing to prohibit, places of public amusement, in the way and to the extent already mentioned, it remains to be seen whether the common council has exercised such power of prohibition. It has passed an ordinance requiring licenses to be obtained of the mayor, and the question is whether such ordinance confers a discretion upon the mayor to refuse licenses, or vests him with no discretion, but simply requires him to grant them in every case. The ordinance is as follows:

"The following named persons or classes of persons are hereby required to be licensed, and licenses shall be granted to them by the mayor to carry on their respective trades or occupations, to wit: Coachmen, drivers of hacks, trucks, cabs, omnibusses, common carriers, carriers of passengers, common criers, hawkers, peddlers, pawnbrokers, auctioneers, junk-dealers, keepers of intelligence offices, and slaughter houses, dealers and speculators in tickets to theatres or other places of public amusements, keepers of billiard saloons, bowling alleys, shooting galleries, exhibitions of circuses, menageries and common shows, and owners or managers of theatres, opera halls, play houses and all other places of public amusements, also public expressmen, public cartmen and public truckmen."

It will be observed that the language is mandatory. The persons enumerated are "required to be licensed, and licenses shall be granted to them by the mayor." And the next section of the ordinance enacts that "the licenses required to be granted by the foregoing section shall be issued by the city clerk and signed by the

mayor." The legislature conferred upon the common council, as we have seen, power to make an ordinance under which places of public amusement could, in the exercise of an absolute discretion, be prohibited. If it be assumed that the common council could delegate such power and discretion to the mayor, has it done so? The word "may" is often held to mean "shall," as, under that mild form, positive duty to do a thing is sometimes created. Mayor, etc., of New York v. Furze, 3 Hill, 612. But the word "shall" is mandatory. It excludes the idea of discretion, when addressed to a public official. In the state of Pennsylvania a statute altogether similar to this ordinance was held to confer no discretion upon the mayor to refuse an application to license a theater. Com. v. Stokley, 12 Phila. 316. The power having been given to the common council, to exercise or not, according to its discretion, it is not for this court, by stretching a point, or by labored construction, to say that it has exercised it. The legislature left it to the common council, and not to this court, to say whether such power should be exercised. To require the mayor to license, as it has done, by no means confers upon him the power to prohibit. Recurring again to the text of the ordinance, it is seen to cover many occupations and businesses. Did the common council intend to confer upon the mayor absolute power to prohibit, for instance, coachmen, drivers, common carriers, junk dealers, billiard saloons, expressmen, cartmen, and truckmen? for these are all enumerated in the ordinance. No distinction in respect of any of them is made. Yet it is, to say the least, a question for argument whether the legislature itself could confer such power in the case of some of them. The power to control or interfere with lawful occupations affords so easy a way to both corruption and tyranny that it ought at all times to be kept within safe limits. Tied. Pol. Power, 289. It is permitted at all only for the sake of the general welfare, and hence only to that extent, and it is noticeable that when it is allowed to go beyond the strict limit it is often used as a cover to arbitrary power and official corruption. Under our system of government, public officials may not assume a power not conferred upon them by some law. They are mere agents and servants of the people, with no power which the people have not given them. We enact laws by our representatives assembled in legislative bodies, and then elect officials to execute them, saying to them, as we point to such laws: "Thus far you may go, and no further. These laws are your power of attorney." The common council of Brooklyn, elected by the people, acting in its legislative capacity, enacted this ordinance, and the mayor may exercise no power in the premises which it does not confer upon him. If we recur to the charter provisions under which the ordinance was framed and passed, we find that the power to prohibit was in express words conferred by the legislature upon the common council only in two of the cases enumerated in the ordinance, which follows the enumeration in the charter itself, namely, places of public amusement (which we are considering) and slaughterhouses. Subdivision 11. The express delegation of the

power to prohibit in these two cases marks and emphasizes the withholding of it in all the other cases. The ordinance (article 2) also contains a provision (section 1) that no person shall conduct or carry on any occupation or business mentioned in the ordinance until he has obtained a license; and then follow various penalties, according to the occupation or business, to be imposed upon conviction in a competent court for violation of such provision. I cannot see in this any intention to vest power in the mayor to refuse licenses, and thereby prohibit, in his discretion. On the contrary, it is only the ordinary method or sanction to execute the ordinance, and compel licenses to be taken out. Nor does the provision in the ordinance that "any person licensed as aforesaid, who shall violate any regulation or provision of this ordinance, shall, upon conviction, have his license revoked by the mayor, in addition to the other penalties fixed by this ordinance," indicate the conferring of such power upon the mayor. Com. v. Stokley, supra. On the contrary, that he is not given the power to revoke a license, except after conviction of the holder in a competent court, makes it plain that the common council carefully refrained from authorizing the mayor to say what persons or places were fit to hold licenses. I may not consider the question whether it might be wise for the common council to give the mayor absolute power and discretion to license or refuse to license places for public amusements, except in so far as it may bear upon the question whether the language under construction can be said to even suggest any intention or disposition of the common council to confer upon the mayor a power so great. And, in the same view, I need not refrain from saying that the existence of such powers as this case has required me to consider has only too often been used for political coercion, the extortion of money, and even the levy of blackmail. Arbitrary power is abhorrent to our system of government. The evils which come from it in cases where it exists will be found, in most instances, graver than those which the grant of it was designed to prevent. To license this place need do no harm. The refusal is put upon the ground that before the town of Gravesend became a part of Brooklyn some prize fights were had in this building. Surely, Brooklyn has policemen enough to see that that does not occur now. The license will not be to violate the law. If in any exhibition there be any violation of law, any citizen, which includes any policeman, may summarily and without warrant arrest the offenders in the act. The laws are ample for the prevention of immorality or of illegal acts of any kind in places of public amusement. Finally, if the common council desires to confer upon the mayor the absolute power and discretion of giving or refusing licenses, it is for it to pass an ordinance to that effect. This court may not do so, but is bound to decide according to laws and ordinances as they are. The motion is granted.