## LAGOON CO. et al. v. UTAH STATE FAIR ASS'N et al.

No. 7255.   Decided February 8, 1950.   (214 P. 2d 614.)

See 3 C. J. S., Agriculture, sec. 14. Declaratory judgments as to leases, see note, 87 A. L. R. 1228. See, also, 16 Am. Jur. 309.

*Grover A. Giles* (former Atty. Gen.), Salt Lake City, *C. N. Ottosen* (former Asst. Atty. Gen.), Salt Lake City, *Elias Hansen,* Salt Lake City, *J. Grant Iverson,* Salt Lake City, for appellants.

*Callister, Callister & Lewis,* Salt Lake City, *Beverly S. Clendenin,* Salt Lake City, *James Ingebretsen,* Salt Lake City, for respondents.

LATIMER, Justice.

Plaintiffs and respondents instituted this action in the court below under Title 104, Chapter 64, U. C. A. 1943, to obtain a declaratory judgment construing a certain lease entered into on the 22nd day of May, 1946, by and between the Utah State Fair Association and Beehive Midways, Inc., a corporation, and to have such agreement declared void. There was a supplemental agreement executed by the parties modifying some of the terms of the original lease, but in view of the fact that the validity of both agreements is determined by the provisions of the original contract we deal only with that one document. The district court held the agreement void for the reason that the officers of the State Fair Association exceeded their statutory authority and a judgment was entered declaring the lease invalid. The defendants appeal from the judgment. The parties are referred to as they appeared in the court below and the defendant Utah State Fair Association is hereinafter designated as the Association and defendant Beehive Midways, Inc., is designated as the Company.

For a number of years prior to the date of the execution of the lease a portion of the fair grounds was uneven and poorly developed. The area was occupied by some stock pens and stables which the Association desired to have located elsewhere. In 1945, the directors of the Association completed master plans and specifications for the overall improvement of the fair grounds. The proposed improvements included the establishment of a midway in the area previously referred to and contemplated the expenditure of large sums of money. The legislature had made no appropriation for such purposes and so the Association attempted to finance the improvements by offering a long-term lease. The reason for the long period was that the directors of the Association believed a lessee would not expend the money necessary to improve the midway and construct the permanent improvements unless the expenditures could be justified by a lengthy occupation of the property and a monopolistic operation of the concessions. Apparently, the directors of the Association concluded that the offer made by the defendant Beehive Midways, Inc., was the best obtainable and the only means of getting the property improved. Accordingly, the lease in question was executed and work on the improvements commenced.

The lease was for a period of five years and the important provisions were substantially as follows: The Company was given the exclusive right to operate and license others to operate all amusements, rides, games and shows upon the property of the Association, during the years 1947 to 1951, inclusive. The Association reserved the right to operate certain transportation facilities around the property and to run check stands, souvenir concessions, and to conduct certain entertainments to be given for the purpose of attracting visitors to the grounds. The Company was given an option to renew and extend the lease for an additional five year period upon the same terms and conditions as any other responsible operator might in good faith be willing to offer. The Company was required to construct cer-

tain buildings, and was authorized exclusively to operate and maintain amusement devices and consessions upon an area which was to be known as the midway. This area was approximately 800 feet long and 210 feet wide. The construction was to consist of laying a hard-surfaced walk in front of the buildings and around the entire midway and erecting not less than twenty buildings with a total frontage of not less than 800 feet, the buildings and the area to be wired for electrical connections. The Company was permitted to lease the buildings to concessionaires and the amounts realized in the way of rents was to be equally divided between the Association and the Company. There were other provisions dealing with the percentage of distribution of admission charges and other fees collected, a detailed description of the rides and amusements to be furnished by the Company or concessionaires, the right of the Association to inspect the Company's books and the reversion of the buildings to the Association upon the termination or forfeiture of the contract.

The defendants have made eight assignments of error. We, however, need only consider two. These are (1) that the trial court erred in concluding that the Association did not have authority to enter into the lease agreement; and (2) that the Association and the plaintiffs are estopped from questioning the validity of the lease agreement. We treat the assignments in the reverse order.

Defendants' contention in support of an estoppel arises out of the facts that the defendant Company expended large sums of money in placing permanent improvements on the property of the Association; that these improvements were to revert to the Association upon the expiration of the lease; and, that under the circumstances of this case it would be unconscionable for the court to set aside the lease and allow the improvements to revert to the Association. We express no opinion as to title to the improvements but we are convinced that the doctrine of estoppel cannot be used to defeat plaintiffs' right to maintain this action.

Defendants have not raised the issue of estoppel in the pleadings and the evidence does not show any act on the part of any plaintiff which might have had a tendency to mislead the defendant Company into executing the contract. Either the Association had the right to enter into the lease with the Company and it is not vulnerable to attack, or the Association exceeded its power and the validity of the lease can be attacked by any citizen or corporation having an interest in the subject matter. The claim of estoppel must fail because of the lack of pleadings and evidence to allege and show such a defense.

The next contention involves the authority of the Association to execute the lease. While the parties have argued at length as to whether the Association was exercising governmental or propriety powers when it entered into the lease agreement, we believe this question unimportant in view of the provisions of our statute. If the legislature either expressly authorized the Association to lease the land and the improvements or expressly prohibited the Association from so encumbering the property then it matters not what powers the directors of the Association were attempting to exercise.

Our concern, then, is with the effect to be given certain statutory enactments which must be construed to determine the legislative intent, for unless the legislature either expressly or by implication granted the Utah State Fair Association the power to enter into the particular lease agreement the judgment must be affirmed.

The sections of the statutes involved are quoted:

Section 85-4-1, U. C. A. 1943:

"The Utah state fair association is continued a body corporate with perpetual succession subject to the direction, supervision and control of the commissioners of the department of publicity and industrial development. It *may have and use a corporate seal, and by the aforesaid name may sue and be sued, contract and be contracted with, and take and hold by purchase, gift, devise or bequest, real and per-*

*sonal property required for its uses. It may also, with the approval of the department of finance, convert such property, when not suitable for its uses, into other property, which may be suitable for its uses, into other property, or into money* provided however, that money received from such conversion shall be paid into the state treasury and placed to the credit of the state fair association maintenance fund. The Utah state fair association shall be deemed a public corporation, and its property shall be exempt from all taxes and assessments." (Italics added.)

### Section 85-4-7, U. C. A. 1943:

"The purposes of the association shall be to promote in the state of Utah stock breeding, agriculture, horticulture, mining, manufacturing, and the domestic sciences and arts; and *the association shall have the authority to use and to lease the property of the association, during any portion of the interval between the holding of the annual or biennial exhibitions, for private stock exhibitions, shows, racing meets, and for other legitimate purposes, upon terms and conditions to be prescribed by the board of directors.* All moneys received from such leases shall be covered into the state treasury at the end of each month and placed to the credit of the state fair maintenance fund." (Italics added.)

### Section 85-4-8, U. C. A. 1943:

"*The association shall hold a biennial exhibition, and may hold an annual exhibition,* of such agricultural, domestic science, horticultural and mineral products, manufactured articles, and domestic animals, as in its opinion subject to the direction, supervision and control of the commissioners of the department of publicity and industrial development, will best stimulate industrial pursuits among the people of this state, and may award premiums for the best specimens of such exhibited articles and animals; provided, that the board of directors may permit competition by livestock exhibited by citizens of the several states and territories of the United States." (Italics added.)

The foregoing sections, all dealing with the powers, purposes, organization and duties of the State Fair Association, must be considered as part of a single statutory arrangement and each section should be construed in the light of and with reference to the other sections. ■ Defendants rely largely on that portion of Section

.85-4-1, U. C. A. 1943, supra, which authorizes the Association to convert unsuitable property into property which will be suitable, while plaintiff asserts that the limitations on the power to lease set forth in Section 85-4-7, U. C. A. 1943, supra, is controlling.

If we look to the primary reasons for the enactments and inquire into their history as shown by the changes and amendments made by the legislature and give effect to the design and purpose of the various enactments, we must come to the conclusion that the fundamental reason justifying the existence of the Association was the promotion of home-owned industry by means of the public exhibitions, and that the power to lease property for extended periods of time is denied by the purposes of the Association, by the wording of the statutes and by the ordinary rules of statutory construction.

We first deal with Section 85-4-1, U. C. A. 1943. In 1907 the legislature changed the name of the Deseret Agricultural and Manufacturing Society to the Utah State Fair Association and prescribed the powers, purposes and duties of the newly created organization. Chapter 132, Section 2120, Laws of Utah 1907, which has now become Section 85-4-1, U. C. A. 1943, provided as follows:

· "The 'Deseret Agricultural and Manufacturing Society' constituted and chartered on the seventeenth day of January, eighteen hundred and fifty-six, shall hereafter be known as the Utah State Fair Association, a body corporate with perpetual succession. It may have and use a corporate seal, and by the aforementioned name sue and be sued and contract and be contracted with and may take and hold by purchase, gifts, devise, or bequest, real and personal property, required for its uses. *It may also convert property received by gift, devise or bequest, and not suitable for its uses, into other property so available, or into money.* It shall be deemed a public corporation, and its property shall be exempt from all taxes and governmental assessments. The title to all property held by the 'Deseret Agricultural and Manufacturing Society' shall be vested in the Utah State Fair Association." (Italics added.)

This section remained unchanged until the laws of the state were codified by the Code Commissioners in 1933. At the time the Revised Statutes of Utah 1933, were adopted the section became designated as Section 85-4-1, and it read as follows:

"The Utah state fair association is hereby continued a body corporate with perpetual succession. It may have and use a corporate seal, and by the aforementioned name may sue and be sued, contract and be contracted with, and take and hold by purchase, gift, devise or bequest, real and personal property required for its uses. *It may also convert such property, when not suitable for its uses, into other property which may be suitable, or into money.* It shall be deemed a public corporation, and its property shall be exempt from all taxes and assessments." (Italics added.)

By this revision, the Code Commission changed certain wording of the act of 1907 and particularly that part of that act which limited the Fair Association in its right to convert property. In the earlier enactment the Association could only convert property received by gift, devise, or bequest, which was not suitable for its use. Under the revised provision the power to convert was extended to include property acquired by purchase. Thus, property which was obtained by that method was made subject to conversion if it was not suitable for the purposes of the Association. However, the extension must be confined by any limitations found in other sections of the statutes. Subsequent amendments did not substantially change the section insofar as it affects our problem as the power to deal with property was left unchanged.

The legislative history of Section 85-4-7, U. C. A. 1943, supra, is substantially as follows: The predecessor section was Section 2121, Revised Statutes of Utah 1898. This section provided:

"The purposes of the society shall be to promote, in the state of Utah, stock-breeding, agriculture, horticulture, mining, manufactures, and the domestic arts."

This section was not changed until 1915, when the legislature enacted Chapter 39, Laws of Utah 1915. The title of this section indicated its purpose to be that of empowering the State Fair Association to lease property for private exhibitions during the interval between annual or biennial state exhibitions. The section as enacted, read as follows:

"The purposes of the association shall be to promote in the State of Utah stock breeding, agriculture, horticulture, mining, manufacturing and the domestic sciences and arts, and *the association shall have the authority to use and to lease the property of the association, during any portion of the interval between the holding of the annual or biennial exhibitions provided for in Section 2128, Compiled Laws of Utah, 1907,* for private stock exhibitions, circuses, wild west tournaments, shows, racing meets and for other legitimate purposes, upon terms and conditions to be prescribed by the regulations of said association; provided that all moneys received from such leases be covered into the State Treasury at the end of each month to be placed to the credit of the State Fair Maintenance Fund."

This section became Section 85-4-7, Revised Statutes of Utah 1933, and by this revised code certain of the words, particularly "circuses" and "wild west tournaments" were deleted from the earlier act, apparently for the reason that the Code Commissioners believed the word "shows" to be all-inclusive. The 1933 section was carried into the Utah Code Annotated 1943, without changes.

Section 85-4-8, U. C. A. 1943, has for all practical purposes, since 1907, remained the same and has required that the association shall hold exhibitions at least biennially, and may hold them annually. From this section it is clear that the legislature intended that the people of this state be given an opportunity to attend an exhibition at least once every two years and that the directors of the Association should so conduct its affairs as to carry out the legislative intent.

When this section is considered in the light of and with reference to Section 85-4-7, U. C. A. 1943, it becomes clear that the legislature further intended that the property of

the Association should always remain free and unencumbered so that there would be no interference with the holding of the exhibitions. The right to lease the property for private purposes was specifically limited to the periods between the annual and biennial exhibitions and a lease was not be be granted which would extend into the period set aside for such purposes.

Moreover, from the history of Section 85-4-1, U. C. A. 1943, its present provisions, and the provisions of the other two sections, it is equally clear that the right of the Association to convert any of its property is specifically limited insofar as leasing is concerned. At the time the code was revised in 1933 the right to lease property was expressly limited and the enlarged powers of the Association indicated by the revision must be circumscribed by the then existing limitations. It may be that for other purposes the directors may convert the property of the Association regardless of how obtained, but by the express wording of Section 85-4-1 the Association does not have the authority to lease the property except during the interval between the holding of the exhibitions.

A State Fair is for the purpose of stimulating the industries of the state and consists not only of the exhibition of livestock, fowls, agricultural and manufactured products, machinery and implements; but, in addition it consists of the shows, exhibits, and attractions usually found and permitted by similar fair associations. The legislature undoubtedly intended to benefit local business and afforded the people of the State of Utah an opportunity to see the improvements being made in sciences, arts, manufacturing, and the products of the soil, and this is in part made possible by the revenue obtained from the noncommitant entertainment which is attractive to many people. The legislators must have felt that if the directors of the Association could enter into and make long-term leases to private individuals and consessionaires to use the property of the Association to the exclusion of others

seeking to use the same property, the principal purposes of the Association would be defeated; that public property would be converted to private use, that operating funds might be diminished, and that the duties of the directors of the Association to stimulate industrial and farming pursuits could be avoided by turning the property over to private individuals. It must have been for these reasons that that legislature provided that any leases granted must be limited to the intervals between exhibitions. The present lease being for five years with the right of renewal for an additional term is in direct violation of the intent of the legislature and in excess of the authority granted to the directors of the Association.

Defendants seek to avoid the express wording of Section 85-4-7, U. C. A. 1943, by contending that the directors could lease to concessionaires during the intervals between fairs and could lease the same property to the same individuals during the fair periods, and that by the simple expedient of writing two leases instead of one the property could be controlled and tied up by a method which would not do violence to the statute. One answer to this contention is that it assumes a situation which would not arise as defendants' evidence definitely establishes that unless the Company could have obtained exclusive control of the property and the concessions for a long term, including the interval between exhibitions and the times of the exhibitions, the lease would not have been executed. Another answer is that long time exclusive control of the State Fair property for private gain is one of the vices prohibited by the statute and if the Association were to enter into arrangements which would violate the fair intendment of the statute the number of documents necessary to accomplish the result would be immaterial. It is apparent the present leasing arrangment does violence to the statute and should be declared in excess of the powers of the Association.

Our holding that the lease is invalid because of its term makes a discussion of the other assignments unnecessary.

The judgment is affirmed. Each party to bear their own costs.

PRATT, C. J., and WADE, WOLFE and McDONOUGH, JJ., concur.