## MIGLIACCIO v. DAVIS, et al.

No. 7412.   Decided June 8, 1951.   (232 P. 2d 195.)

Rehearing Denied October 4, 1951.

See 31 C. J. S., Estoppel, sec. 108. Acquiescence in improvements to realty as working estoppel to assertion of antagonistic title. 19 Am. Jur. Estoppel, sec. 133; 76 A. L. R. 304.

*A. J. Ruggeri,* Price, *Herbert Van Dam, Jr., R. A. Mc-Broom,* Salt Lake City, for appellant.

*Henry Ruggeri,* Price, *Moynihan-Hughes-Sherman,* Montrose, Colo., *Luke G. Pappas,* Price, *Lewis Larson,* Manti, for respondent.

LATIMER, Justice.

Appellant commenced this action in the district court to quiet title to certain mining claims in Emery County, Utah, which were located under the name of Vanadium King, Nos.

1 to 7, inclusive. Respondent, Frank Davis, answered and asserted title to an undivided ⅜ths interest in the property by virtue of a quitclaim deed from his brother, John B. Davis. A judgment was rendered in favor of Frank Davis whom we shall hereinafter refer to as respondent, and this appeal followed.

We need not develop the early history of the claims. Suffice it to say that prior to the transactions out of which this litigation arises, John B. Davis was the owner of a ¾ths interest in the claims and other parties were the owners of the remaining ¼th interest. Appellant claims to have obtained title to the undivided ¼th interest by a quitclaim deed from one J. W. Jensen and wife, dated June 1948, and the other ¾ths interest by a quitclaim deed from John B. Davis and wife, dated May 27, 1942. Respondent founds his title on a quitclaim deed from John B. Davis, dated and recorded August 9, 1948.

The trial court found for respondent on the theory that appellant was estopped to question the validity of the last mentioned deed. Appellant assails this finding and this point presents the principal contention on this appeal. We, therefore, relate only those facts relevant to that issue.

According to the testimony of one F. B. Hammond, a practicing attorney, John B. Davis and his wife, whom Hammond represented, on the 27th day of May, 1942, executed a quitclaim deed conveying their ¾ths undivided interest in the seven claims to the appellant; that appellant was not present at the time the deed was executed, and the grantor John B. Davis directed that the deed was not to be delivered to him unless and until certain litigation concerning other claims, and identified as the Gibbons litigation, had been compromised and settled or dismissed; that in the forepart of 1948 activity in the area created some demand for mining property and appellant solicited Hammond to help him obtain a lease on the property from Jensen, which was refused because Jensen had a judgment against appel-

lant; that the Gibbons litigation was not settled satisfactorily to the parties until January 19, 1949, at which time Hammond delivered two deeds to appellant, namely, the quitclaim deed to the Vanadium King claims and a quitclaim deed to an interest in the property involved in the Gibbons controversy; and that delivery was made by enclosing the two deeds and a forwarding letter, signed by plaintiff, in an envelope, addressed to Nellie B. Young, County Recorder, Castledale, Utah.

Prior to the time Hammond claims to have delivered the deed and on or about the 9th day of August, 1948, John B. Davis, who was then unmarried, conveyed to respondent, by quitclaim deed, an undivided $\frac{1}{2}$ of his $\frac{3}{4}$ths interest in and to the mining claims. This deed was executed under circumstances which will hereinafter be referred to and was recorded on the same date. It is by virtue of appellant's misleading acts and conduct immediately preceding the execution of the deed which caused the court to conclude as a matter of law that the latter was estopped to question the priority of the deed.

Admittedly, the facts upon which the estoppel is based were not confined because the issue was not pleaded, but they are sufficient to sustain the judgment. The trial judge attempted to have the respondent plead generally the facts upon which he relied to establish his theory of estoppel, but appellant conceded they could be introduced under a general denial, and, based on that concession, the cause proceeded to trial. Trying affirmative defenses without appropriate pleadings is not good practice as testimony can be better presented and the materiality of evidence better determined if issues are canalized by proper pleadings or by pre-trial orders.

Passing to the evidence relating to estoppel and stating it in narrative form favorable to respondent, the trial court could reasonably have found that some time in May of 1948, he, having read or heard that uranium had been located

in the vicinity of the claims, contacted appellant with regard to the operation of the property. During these negotiations, which concerned a joint acquisition and operation of the property appellant informed respondent that he had acquired the 1/4th interest of Jensen, but nothing was said about appellant having acquired the other 3/4ths interest still shown on the records as belonging to John Davis. On June 8, 1948, respondent, having heard about a dispute over the property, wrote his brother, John B. Davis, who was then in Oregon, notifying him that he was being cheated out of his property and that he should immediately come to Utah to protect his interests. In this letter he stated that appellant had informed him he was claiming John B. Davis' interest in the property because appellant had been informed by his attorney that a deed had been executed conveying the property to him. Shortly after this letter was written John B. Davis appeared in Sunnyside, Utah, and discussed the status of the property with Frank. At about this time, John was asked by respondent Frank about appellant's claimed ownership of John's 3/4ths interest and John stated that if any one claimed they had a deed conveying an interest in the property it was a forgery as he had never executed any deed to the claims. On June 28, 1948, immediately after appellant obtained and filed for record his deed for the 1/4th Jensen interest (only incidentally involved in this judgment) appellant and the two Davis brothers proceeded from Sunnyside to Salt Lake City to consult with a land attorney for the purpose of securing respondent some interest in the property and to protect every one's interest in the claims by filing a notice in intention to hold. The three parties went to the attorney's office and in a conversation on June 29, 1948, in the presence of all three, the attorney, in order to prepare the notice, asked who was the owner of the claims. He was informed that John owned a 3/4ths interest and that appellant owned a 1/4th interest. While appellant did not make the statement, he participated in the discussion and he neither refuted nor challenged the statement as incorrect,

nor claimed any other or different interest. The parties were advised by the attorney that it was necessary to file a declaration of intention to hold the claims and a document was prepared by him showing both parties claiming an interest. This declaration, while not signed, was notarized at that time and shows that it was executed by John on behalf of himself and his co-claimant, namely, appellant. The three parties returned to Sunnyside and the discussions while travelling to and from Salt Lake included the ownership and operation of the property. The official records of the county recorder in Emery County show that the declaration of intention to hold was recorded on the 29th day of June, 1948, at the request of appellant. It was presented by him personally to the recorder and returned to him after recordation.

On August 9, 1948, the three mentioned parties proceeded to Castledale, the county seat, to examine the title records in the office of the county recorder. After the examination of the records, the county attorney, who was present in the recorder's office, was signalled over to the counter where the parties had been in consultation and was requested to prepare a deed for John's signature. The appellant did not proceed upstairs to the office of the scrivener where the deed was typed, but he was well within hearing distance of the discussions in the recorder's office. When the deed was first prepared it was not acceptable to John because it conveyed his 3/4the interest and he claimed he was only intending to convey one-half of his interest. The deed was then changed to take care of this error and it was given to the recorder to be recorded. After this was accomplished the parties returned to their homes in the same motor vehicle. During the time the three of them travelled to and from Price, Utah, they discussed the interest that was to be and was conveyed to respondent.

The evidence is undisputed that respondent invested time and money in developing the property. According to appellant, the agreement was that respondent, who had available

cash, would furnish the money; each would contribute their efforts; and the profits from the venture would be split on an even basis. Respondent's testimony substantiates this as being the original agreement, except as to the interest he was to obtain in the real property, because the third member, John, did not then contemplate participating. Subsequently, on October 1, 1948, John returned and the agreement was modified to provide for a three-way division of the profits. This arrangement lasted until November, when John quit and transferred his remaining interest, if any, to respondent in consideration of receiving 10 percent of the gross receipts for two years. However, there was no showing that appellant knew of or participated in the negotiations for this conveyance.

Respondent's financial contributions consisted, in part, of purchasing an air compressor for $2,264, a jack hammer for $255, a lighting plant for $430, a horse, mule and dump car. In addition, he advanced money and assisted in constructing a chute and loading platform. He and his wife took over the bookkeeping and financial duties. He worked on the property and contributed personal services to the venture until difficulties were encountered with appellant. After these difficulties developed respondent worked the claims where the equipment furnished by him could be utilized while appellant worked the dumps. Shortly thereafter the breach between the parties widened, appellant was prevented from remaining on the property, and litigation ensued.

Appellant argues that since the court found that respondent had knowledge of the prior unrecorded deed before he obtained his claimed interest in the property that he is precluded from relying on the doctrine of estoppel. This is the only contention which merits consideration.

The general rule of equitable estoppel is set forth in the following language in 19 Am. Jur., page 634, Sec. 34:

"* * * Equitable estoppel or estoppel in pais is the principal by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying or asserting the contrary of, any material fact, which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words and conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed."

The trial judge could reasonably find from the record in this case that respondent was excusably ignorant of the facts concerining the real ownership of the property. In this connection we mention that respondent's brother John while named as a defendant testified for appellant. Apparently, there was hostility between the two at the time of trial, so that respondent was not the beneficiary of brotherly help. The deed under which appellant claims was executed in 1942. It was not delivered until January, 1949; and, according to respondent's version of a conversation, appellant admitted he did not know the deed was executed until he was so informed by his attorney. Appellant did not acquire the Jensen interest until June 1948, and from the time he gave up his prior lease on the property in 1942 he performed little or no assessment work on the claims and had seemingly abandoned all his interest in the property. He exhibited little interest in working the claims until respondent consulted with him in regards to financing the operations of the property because of the possible presence of uranium. Respondent and appellant discussed the possibility of developing the claims and the interest each should acquire; and, while appellant made mention of owning Jensen's ¼the interest, he failed to mention any claim to John's ¾ths interest. This, in spite of the fact that the two parties discussed the desirability of having John return from Oregon to participate in the venture. Unquestionably, respondent had heard rumors prior to June 8, 1948, that trouble was developing over the property and

that appellant claimed to have acquired John's interest. In one of the conversations appellant must have made some mention of the latter fact as the following paragraphs are taken from respondent's letter of that date to John:

"* * * You don't have much time left to get this all settled so you can work it if possible by July 1st.

"The better thing to do as far as I see is to see a Federal Land Attorney and explain the whole thing to him, * * *

"Miggliacio [sic] told me you turned all of your shares over to him before you left and he didn't know a thing about it until his attorney told him about it. So let me know what it is all about and I will try to do something about it for you if it is possible without you being here. But you can see they are not too anxious to have you around, and you can see what they are trying to pull."

Shortly after the receipt of this letter John returned to Price and respondent asked him if he had conveyed away his interest in the property and John assured him he had not, and that if any one claimed to have a deed it was a forgery as a deed had not been signed by him. A deed was not available to exhibit to respondent, the public records showed no transfer of the interest, appellant never mentioned that an executed but undelivered deed was left with Hammond, and it was some time after respondent obtained his conveyance that appellant first made the deed a matter of record.

While it is most difficult to fix the times and detail of the substance of many of the conversations, the record fairly reflects that as of June, 1948, there was a great deal of confusion over the rights of individuals in the property and it seems reasonable to conclude that at that time appellant was unaware of any deed conveying the land to him as he solicited Hammond to obtain a lease for him. Undoubtedly, the trip to Salt Lake to see a land attorney was prompted by the suggestion in respondent's letter to his brother of June, 1948, and was for the purpose of holding the property pending the clearing up of the title. Certainly immediately prior to and from that date on, the actions and

conduct of appellant are entirely inconsistent with those of an individual who claims to have acquired an interest in property, and such conduct would have a tendency to mislead any one as to who was the true owner. Respondent had inquired of his brother whether a deed had been executed and he was assured such was not the fact. Shortly thereafter respondent, appellant, John, and one Oliver Sutch travelled together by car from Price, Utah, to Salt Lake City. According to the evidence of two of the travellers one of the purposes of the trip was to determine how to protect the interest despondent was to get for financing the operation. During the journey, the parties discussed the ownership of the property and when they arrived and discussed the matter with the Salt Lake land attorneys a specific question was asked as to who were the owners. John Davis said he owned a ¾ths interest and the appellant a ¼th interest. Appellant not only did not refute this, he actively participated in the discussion, permitted the lawyer to prepare a document showing him and John to be co-claimants and subsequently personally delivered the document to the county recorder to be recorded as a public record and had it returned to him after recordation. Becouse of some oversight the document was not signed but its contents clearly disclose that John was claiming to be the pricipal owner and applicant a co-owner. The discussions on the way back from Salt Lake City included talking over the joint ownership and operation of the property.

On August 9, 1948, the three participants drove to Castledale for the purpose of checking the public records on the property. According to the testimony of respondent they discussed the interest he was to be given to secure his investment in the venture. During this discussion it was mentioned that he was to receive one-half of John's ¾ths interest. When the parties arrived in the office of the county recorder they inspected the record and there was no deed recorded. After satisfying themselves as to what the records disclosed, they consulted with the county attorney

who was working in the recorder's office. He was requested to prepare a deed from John to respondent. While a great portion of the conversation was had in his office and appellant was not present, after the deed was prepared it was taken down and in the presence of appellant turned over to the county recorded for recording purposes. The three parties returned to Price, Utah, and on this journey they discussed respondent's part ownership in the property.

Over the full period of time involved, appellant's conduct of silence when he should have spoken was calculated to and did mislead respondent into believing that his brother had not parted with his interest in the property and that he, John, could secure respondent's rather heavy investment by conveying a portion of his interest.

It ill behooves appellant to contend now that respondent should suffer the loss because he was inexcusably negligent in not ferreting out the undisclosed truth. If appellant knew of the deed in Hammond's possession an honest disclosure of that fact by him at any time before August 9, 1948, might have permitted respondent to protect his investment by other methods.

One other principle of law bears mention. It is stated in 19 Am. Jur., Estoppel, paragraph 133, page 787:

"Numerous decisions predicating the existence of an estoppel to assert an interest in real property have been based upon evidence which included the element of non-disclosure of an interest at the time when the contract for the conveyance of the property in question was being consummated and also the element of a continued silence after the grantee had entered into possession of the property and expended money in improving it. In most of the cases in which the doctrine of estoppel has been adopted, the money of the party alleging the estoppel has been applied to the making of tangible improvements; and it is a rule almost of universal application that one who stands by and sees another purchase land or enter upon it under a claim of right and permits such other to make expenditures or improvements under circumstances which would call for notice or protest cannot afterward assert his own title against such person. As

some of the authorities broadly state the principle, one who knowingly and silently permits another to expend money on land under a belief that he had title will not be permitted to set up his own right to the exclusion of the rights of the one who made such improvements
* * *"

The exception to this rule is applied to one who improves or expends the money when he is acquainted with the true character of his title or with the fact that he has none. Certainly the facts of this case as previously detailed bring the respondent within the rule and not within the exception. In addition, it would appear contrary to common sense for respondent to invest in a mining venture without some memorandum in writing if he knew he had no interest on the claims.

The trial judge heard and evaluated the testimony, saw the witnesses, had an opportunity to observe their demeanor, and was able to form an opinion as to their veracity. It might be that were we in his place we might have concluded that the evidence and the imponderables tilted the scales in favor of appellant, but this does not require reversal. Under well known principles announced by this court unless the evidence clearly preponderates against the findings the judgment must be affirmed. As we read and interpret the record the evidence sustains the findings.

The judgment of the trial court is affirmed. Costs to respondent.

WOLFE, C. J., and McDONOUGH, J., concur.

CROCKETT, J., not participating.

WADE, Justice (dissenting).

Because I believe that (1) it is unreasonable to find from this evidence that the respondent entered into these transactions without being first informed of John B. Davis' deed to appellant, and (2) the trial court expressly found that respondent had been informed of that deed before he en-

tered into these transactions, I dissent from the court's decision in this case. If I am correct in either of the above propositions then under the law as stated in the prevailing opinion there was no estoppel for if respondent knew of the prior deed from John B. Davis to appellant he was not "excusably ignorant of the true facts." 19 Am. Jur., 634, Section 34 quoted in the prevailing opinion. I consider the second proposition first.

The trial court expressly found that

"the defendant, Frank Davis, (respondent) had heard of the existence of a deed from J. B. Davis to plaintiff (appellant) but, on the other hand, plaintiff knowingly permitted said Frank Davis to believe that he was acquiring one-half of the three-fourths interest of the said J. B. Davis and participated in the transaction which resulted in the execution and delivery of the said deed of August 9, 1948, and knowingly permitted the said Frank Davis to perform labor and expend money relying thereon."

Thus the court clearly and without ambiquity found that the transactions between these parties were entered into after respondent had heard of John's deed to appellant but that appellant was nevertheless estopped because he participated in the transactions knowing that respondent believed that he was getting one-half of John's interests regardless of John's prior deed to appellant. The prevailing opinion makes no claim that this finding is not supported by the evidence, it merely claims that the evidence would support a finding of fact contrary thereto and it seems to recognize that if the facts were as found there was no estoppel so it completely ignores this finding of ·fact instead stating that the trial court could reasonably find that appellant informed respondent that he had acquired the one-fourth interest of Jensen but nothing was said about appellant's having acquired the interest of John B. Davis.

This is certainly a novel way of over-ruling the trial court's findings of fact. Since in law actions there is no appeal to this court on questions of fact, and even in equity

cases we do not disturb the trial court's findings of fact unless they are manifestly contrary to the weight of the evidence, to thus nullify such findings is contrary to any recognized practice in this state. Of course where a jury returns a general verdict, a board or commission renders a decision, or a trial court enters a judgment, without expressly finding the facts this court will not reverse such decision if it can be sustained by assuming the existence of facts most favorable to such decision which could be reasonably found from the evidence. Apparently the prevailing opinion invoked this rule rather than the rule applicable to this kind of a case to the effect that we are bound by the findings of fact of the trial court if such facts can be reasonably found from the evidence, or are not manifestly contrary thereto.

Even if we could lawfully ignore the trial court's findings of fact and substitute therefore our own contrary findings, I believe it is unreasonable to find from this evidence that respondent had been told only of Jensen's deed but knew nothing of the deed to appellant from John B. Davis. It is true that respondent testified something to that effect on cross-examination, in trying to explain a statement he wrote in a letter to his brother John dated June 8, 1948, wherein he expressly writes that appellant had told him of that transfer. This explanation was only one of many untenable explanations which he offered when pressed on cross-examination. I doubt that he seriously intended any one to believe that explanation, even his own attorneys have not taken it seriously nor stressed it on this appeal. The Jensen deed was probably not in existence when this letter was written, for it was recorded on June 28th, twenty days thereafter, and though that deed is only dated June ____ 1948, there is nothing in the evidence which indicates that it was not recorded immediately after its execution. In the letter of June 8, 1948, respondent writes:

"Migliaccio [sic] told me you turned all of your shares over to him before you left * * *"

The wording of this statement and the context of this letter leaves no room for doubt that he refers to the deed from John rather than the Jensen deed. He expressly writes John that appellant had told him of that transfer. Respondent wrote the letter while John was residing out of this state to tell him that respondent is claiming his interest in these claims and asking him to return and defend his rights thereto. There was no occasion for writing this letter at all if respondent had only claimed the Jensen interest. The fact that respondent wrote John that appellant was claiming John's interest, conclusivley shows that respondent then knew of that claim, for it would be fantastic to believe that he would write such a letter if he had never heard of such a claim. Appellant's wife who is said to have typed this letter, freely admitted that appellant had told them of this deed before the letter was written, but she claimed that it was not valid because it was not recorded. In the face of this record it is hard to conceive of a case where the evidence is stronger of the existence of any fact than it is here in favor of appellant and against the facts as claimed in the prevailing opinion. I think it is absolutely unreasonable to believe the above stated fact claimed in the prevailing opinion and therefore for both these reasons I must disagree with my associates.