Max BARASH, Appellant,

v.

Fred A. SEATON, Secretary of the Interior, Appellee.

No. 14069.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 27, 1957.

Decided April 25, 1958.

Mr. Marvin J. Sonosky, Washington, D. C., with whom Mr. Philip P. Marenberg, Washington, D. C., was on the brief, for appellant.

Mr. Fred W. Smith, Atty., Dept. of Justice, with whom Mr. Roger P. Marquis, Atty., Dept. of Justice, was on the brief, for appellee.

Before EDGERTON, Chief Judge, and BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

On June 5, 1953, appellant filed an application with the Secretary of the Interior for a noncompetitive oil and gas lease covering 954.51 acres of acquired land.[1] Acquired land is Government owned land acquired from private ownership. Public land is Government owned land which was part of the original public domain. For leasing procedures, both are governed by the provisions of § 17 of the Mineral Leasing Act of 1920, as amended, 30 U.S.C.A. § 226.[2]

These provisions require the Secretary to issue a lease to the first qualified applicant, providing the land is not within any known geologic structure of a producing oil or gas field. If the land is within such structure, it must be leased to the highest responsible qualified bidder by competitive bidding. The question whether lands are within such structure is one of fact which the Secretary has delegated to the Director of the Geological Survey who is required by the Secretary's regulations to define the bounda-

---

[1] This included three parcels: "Parcel 1—462.57 acres, Parcel 2—453.64 acres, and Parcel 3—38.30 acres."

[2] Acquired lands are leasable under the Mineral Leasing Act for Acquired Lands of August 7, 1947, c. 513, 61 Stat. 913, 30 U.S.C.A. § 351 et seq. Section 3 of that Act, 30 U.S.C.A. § 352, and the regulations issued thereunder, 43 C.F.R. 200.4, make applicable to acquired lands the leasing provisions of the Mineral Leasing Act of 1920.

ries of the structure and delimit the definition on maps filed in the appropriate field offices. 43 C.F.R. § 192.6. Notices of these determinations have been published in the Federal Register since the effective date of the Administrative Procedure Act of June 11, 1946, c. 324, § 3(a) (3), 60 Stat. 238, 5 U.S.C.A. § 1002 (a)(3).

It has been stipulated that Barash "was and is the person first making application for a noncompetitive lease covering the 954.51 acres who is qualified to hold a lease under the Act." And the Secretary admits that "no map or diagram was placed on file * * *" by the Director of Geological Survey, nor was there publication in the Federal Register.

In September 1954, more than a year after Barash filed his application, he learned, in the course of trying to expedite issuance of his lease, that the land had been offered for competitive leasing in July 1953 and that three leases had issued, all without notice to him: two leases to the Texas Company, effective September 1, 1953, totaling 916.21 acres; and one to Baker & Taylor, effective October 1, 1953, for 38.30 acres. Thereupon Barash protested to the Secretary and requested cancellation of these competitive leases and the issuance of his lease. Subsequent administrative proceedings disclosed that the Bureau of Land Management had based its decision to offer the lands in question for competitive leasing on a memorandum to the Bureau from the Acting Director of the Geological Survey, in reply to an inquiry by the Department of Agriculture which exercised administrative control of the acquired lands in question. The memorandum, dated June 12, 1952—a year before appellant filed his application—reads, in pertinent part:

" * * * The Department of Agriculture, Soil Conservation Service, has inquired of the Geological Survey whether it is in the best interests of the United States to offer for competitive lease sale certain lands in Gray County, Texas.

"The records of the Geological Survey disclose that this land may be subject to drainage of its oil and gas content as the subject area is on the southern edge of the Panhandle field. In order that the extent and worth of the deposits in the field may be determined and development may proceed in an orderly manner, the Geological Survey *recommends* that the oil and gas rights owned by the United States within the area involved be offered for lease in accordance with the competitive leasing provision of the Mineral Leasing Act, as amended." [Emphasis supplied.]

Following appellant's protest, the Bureau of Land Management requested the Geological Survey to "be advised as to the date on which this land was determined to be within the known geologic structure of the Panhandle Field and whether such determination was effective as to all the lands embraced in [appellant's] application." The Acting Director gave the following advice on February 11, 1955:

"As of June 12, 1952, when the Geological Survey reported that the Lake McClellan Park Lands 'may be subject to drainage,' no determination had been made as to whether all of the lands were or were not within a *known geologic structure.*

"A review of the structural aspects of the lands involved has been made as of June 5, 1953, the date of filing of [appellant's] application. This review shows that part of the lands on which competitive leases were sold in July 1953 are not within a known geologic structure as those limits were deemed to exist on June 5, 1953.

"The lands believed to be within the known geologic structure are confined to surveys (sections) 9 and 10 of the subdivision of the Rockwell County School Land, Gray County, Texas [totaling 335.90 acres]. The remainder of the lands [totaling 618.61 acres] were not within a

known geologic structure on June 5, 1953."

Based upon the foregoing memorandum, the Bureau of Land Management held that (1) appellant was entitled to a lease on the 618.81 acres because they "were not then and are not now situated on a known geologic structure"; and (2) appellant was not entitled to a lease on the remaining 335.90 acres because they "were actually defined as being on the known geologic structure of Panhandle Field prior to June 5, 1953 [the date of appellant's application]." Upon appeal by both parties, the Secretary decided against appellant as to the entire 954.51 acres. Appellant thereupon brought this suit to review the Secretary's refusal to issue a lease to him. Upon cross-motions for summary judgment, the District Court entered judgment for the Secretary and dismissed the suit.

In this appeal appellant contends, *inter alia*, that no determination has ever been made that the lands in question "are within any known geological structure of a producing oil or gas field," as required by 30 U.S.C.A. § 226 for competitive leasing. He says the Survey's memorandum of June 12, 1952 is merely a recommendation for leasing competitively and that this is confirmed by the following: (1) the Survey's memorandum of February 11, 1955 that "no determination had been made [in connection with the June 12, 1952 memorandum] as to * * * all of the lands * * * *"; (2) the fact that no map showing the definition of the structure was ever prepared or filed as required by the Secretary's regulations; and (3) the fact that there was no publication of notice of definition in the Federal Register as was the Department's practice whether or not required by the Administrative Procedure Act, 5 U.S. C.A. §§ 1002(a) (2, 3), 1002(b).

We think these contentions are not met by appellee's answer that, while the Survey's memorandum of June 5,

1952 merely "recommends" competitive leasing, in reality the Survey "found that it is within the known geologic structure [etc.]." Otherwise, says appellee, "one [would have to] assume that the Survey did not know its function under the law, or that, if it did know it, was refusing to discharge it, neither of which assumptions is at all tenable." The provisions of the law and regulations are too clear and unambiguous to permit reliance on such speculation. McKay v. Wahlenmaier, 1955, 96 U.S.App.D.C. 313, 226 F.2d 35; see also Harmon v. Brucker, 1958, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503.

These provisions require (1) a determination by the Survey that the lands "are" within a known structure, and (2) the filing of a map reflecting this determination in the definition of the structure. These requirements were not observed in respect of either the parcel of 618.81 acres or the parcel of 335.90 acres. Even with respect to the latter parcel, the belated "determination" in the Survey's February 11, 1955 memorandum stated only that these are "lands believed to be within the known geologic structure." Before the statute was amended in 1946, the Secretary had authority to lease lands competitively which were "believed" to be with such a geological structure.[3] The amendment, however, limited his authority for competitive leasing to lands which "are" within such a structure.[4] This change was adopted over the specific objections of the then Secretary. Under the view the Secretary advances here, this change is given no meaning or effect.

In this case the Secretary does not claim, as he did in McKenna v. Seaton, 103 U.S.App.D.C. ——, —— F.2d ——, that his construction of the law and regulations is consistent with established practices of the Department.

The requirements of law involved here do not rest upon technical considerations. They are designed to assure fairness in

**3.** Act of August 21, 1935, c. 599, § 1, 49 Stat. 673, 676, amending § 17 of the Mineral Leasing Act of 1920.

**4.** Act of August 8, 1946, c. 916, § 3, 60 Stat. 951, 30 U.S.C.A. § 226.

leasing publicly owned lands. This case makes that plain. Appellant relying on the absence of any filing of a map showing the definition of a structure pursuant to a determination, applied for a noncompetitive lease. He had every reason to believe that the lands were subject to noncompetitive leasing. He had no reason to question it from the time he filed his application until the Secretary advised him that the lands had been leased competitively after the application had been filed. Thus, by the Secretary's failure either to take the prescribed steps or to give appellant actual notice that the lands were subject to competitive leasing before such leasing was accomplished, appellant was deprived of the opportunity of acquiring any kind of lease.

■ Appellee's final contention, that The Texas Company is an indispensable party, is disposed of by Work v. State of Louisiana, 1925, 269 U.S. 250, 254–255, 46 S.Ct. 92, 94, 70 L.Ed. 259. That case held that neither the United States nor homestead entrymen on the land were indispensable parties to the suit to restrain the Secretary of the Interior from rejecting Louisiana's claim to the land "independently of the merits otherwise, upon an unauthorized ruling of law * *." In the absence of The Texas Company as a party in the present case we do not now order cancellation of any of the Secretary's leasing agreements with The Texas Company. We leave to the District Court, in further proceedings consistent with this opinion, the resolution of issues relating to those agreements.

Reversed and remanded for further proceedings in accordance with this opinion.

FAHY, Circuit Judge (concurring in part and dissenting in part).

I concur in holding that the application of appellant for a noncompetitive lease covering the 618.81 acres, later included in the lease to The Texas Company, could not validly have been denied on the facts in this record, which show that this acreage was not within a known geologic structure of a producing oil or gas field at the time appellant's application was filed. As to the 335.90 acres, however, I would not disturb the Secretary's decision. I think that decision must be read as including a conclusion, or finding, that this acreage was within a known geologic structure when appellant's application was filed. Such conclusion, or finding, I think should not on this record be overturned by the court.