403 P.2d 781

William J. COLMAN, Plaintiff,

v.

UTAH STATE LAND BOARD, Defendant.

No. 10132.

Supreme Court of Utah.

June 30, 1965.

---

8. Ibid.

15

Clyde, Mecham & Pratt, Frank J. Allen, Salt Lake City, for plaintiff.

A. Pratt Kesler, Atty. Gen., Ronald N. Boyce, Chief Asst. Atty. Gen., Salt Lake City, for defendant.

CROCKETT, Justice:

Plaintiff seeks review of a decision of the Utah Land Board which rejected his ap-

plication for an oil and gas lease on a 320-acre tract of state-owned land in Uintah County.[1]

The position of the plaintiff is that because he filed the first application for an oil and gas lease on the land in question, in which he offered $1 per acre, the Land Board was compelled to approve it solely because of his priority in filing. The Board rejected his contention and ruled that the leasing on the land was subject to competitive bidding and so proceeded.

Title to the land in question was transferred by the federal government to the state of Utah on February 9, 1961, as so-called "school lands" under the Dawson Acts, 43 U.S.C. § 870 (1958). At that time there were unexpired federal-granted leases for gas and oil drilling on this land. The leases expired July 31, 1962, but the Land Board was not notified and did not learn of this fact until March 27, 1963. Four days thereafter, April 1, 1963, plaintiff filed his application for a lease. Since on several occasions (the record refers to seven instances) the Land Board had failed to receive notice of expiration of federal-granted oil and gas leases on land conveyed to the State, and because the Board was uncertain as to the proper procedure in such cases, it deferred action on the plain-

tiff's application and requested an opinion of the Utah Attorney General as to the proper treatment of such applications under the Land Board Act.[2] On May 7, 1963, he issued his opinion that the leasing should be under the bidding procedure set forth in paragraphs b and c of Section 65–1–45, U.C.A.1953 (1963 Supp.), because the leasing rights in such lands were "newly acquired" within the meaning of that statute. The Board so proceeded, offering the lease to the public on bids. The plaintiff refused to participate, and the lease was granted to the high bidder at $12 per acre.

In support of his position that the Board was compelled to grant him the lease because of priority of application, the plaintiff argues that this land does not meet the requirement of Section 65–1–45, just referred to, asserting that it had not " * * * become available for leasing by the state because they are newly acquired * * * " and is therefore not covered by the competitive bidding procedure. He rationalizes his position as fair and reasonable by asserting that anyone interested in a particular tract of land can determine, by periodic examinations of records kept by the Department of the Interior, and/or the Land Board, when a tract of land previously under federal lease becomes available for

---

1. The procedure for review of the Land Board decision is set forth in Rule 65B (b) (2); (3), U.R.C.P.

2. The Land Board requested an opinion from the Attorney General and acted in conformity therewith: See Opinion 63–030, 1964 Biennial Report of the Attorney General 224.

leasing by the State, and that this "first applicant" rule is intended to reward alertness and initiative in doing so.

■ Before considering Section 65–1–45, relied on by the plaintiff, and upon which the Land Board based its decision, we digress to comment on Section 65–1–88. Attention has been called to the latter section as giving some plausibility to the plaintiff's position because it provides that, "Except as otherwise provided by section 65–1–45, * * * oil and gas leases * * shall be issued to the applicant first applying for the lease who is qualified to hold a lease under the act." [3] Both the plaintiff and the Land Board have correctly assumed that the critical problem is whether the lands in question should be treated as having "become available for leasing * * because they are newly acquired" and are thus governed by 65–1–45. If they are, they fall within the first clause of Section 65–1–88 just quoted, that is, "Except as otherwise provided by Section 65–1–45 * * *," which exception has the effect of directing us to look at the latter section to see what is "otherwise provided" therein. It states that "[A]pplications to lease shall be *considered* in the order filed * * *." And it must be conceded that subsequent language seems to imply that the application prior in time should be granted. But the provision we regard as important here, and upon which the opinion of the Attorney General and the action of the Land Board pursuant thereto was based, is in the second paragraph of Section 45, which provides that: "In all cases where lands *become available for leasing* by the state because they are *newly acquired* or because a previous mineral lease is cancelled or otherwise terminated by the board, such lands shall be offered for mineral lease by the following procedure * * *" and sets forth requirements that notice be given that the land has so become available for leasing and allowing 15 days for the filing of sealed bids; and for awarding the lease to the highest bidder.

As to this land having been "newly acquired," it is true that the State had obtained title to it two years before. But when it "became available for leasing" is quite another matter. We think it involves no strained analysis of the facts here shown to agree with the conclusion of the Land Board that "the obvious construction requires the statute to be interpreted as providing that * * * the date upon which the Land Board first receives actual no-

---

3. Sec. 65–1–88, U.C.A.1953 as an amendment to Sec. 65–1–45 by the 1959 Legislature S.L.U.1959, Ch. 132, at 302–03. However, the first five paragraphs of the statute were codified as Sec. 65–1–45, U.C.A.1953, while Sec. 4 as enacted was codified as Sec. 65–1–88, U.C.A.1953. The 1963 Legislature amended Sec. 65–1–45, U.C.A.1953 by adding a new subsection (c) and moving the original (c) to subsection (d). S.L.U.1963, Ch. 167, at 573.

tice of the expiration or cancelation of a federal lease * * * is the date upon which the Land Board should assume jurisdictional control over the lands, and is the date upon which the lands which are newly acquired first become available for leasing." [4] Looking at the situation realistically one will realize that the date of "actual notice" is the very first time the Land Board could do anything about leasing such land. In spite of the fact that the State took title in February, 1961, the State acquired it subject to the outstanding federal leases, and of course could not itself grant a similar lease until the federal leases expired.[5]

It is not disputed that the Land Board carried forward with dispatch the procedure for leasing these lands after March 27, 1963, when it first received notice that the federal leases had expired. We perceive no dereliction of the Land Board in the performance of its duty in that regard.[6] On the other hand, it appears to have been well advised in seeking the opinion of the Attorney General and in acting in conformity therewith.

The statutes we have referred to should be considered together and in connection with the entire act and harmonized insofar as possible with the carrying out of the responsibilities the Land Board is charged with of managing the public lands of the State in the most prudent and profitable manner possible. Viewed in conformity with that objective, it appears to be intended that when mineral leasing rights are "first available for leasing" they should be put on the open market and an opportunity for competitive bidding be given. This safeguards the interests of the State by getting the best price a qualified bidder will pay, and also protects the interest of all persons who might be interested by allowing them a fair opportunity to bid.

Support of the Land Board's action is also found by noting particularly the wording of Section 65-1-45: that the "applications shall be *considered* in the order filed." This does not seem to be a mandate that the applications must be *granted* in that order. Although it does appear to indicate that, all things else being comparatively equal, as among qualified appli-

---

4. 1964 Biennial Report of the Utah Atty. Gen. 224, at 226-7, incorporated by reference into Finding of Fact 8 of the Land Board in this case.

5. See Jacobson v. State Land Board, 12 Utah 2d 307, 366 P.2d 70 (1961) for a discussion of state management of lands encumbered with federal leases, which leases are subject to the provision and terms of the Mineral Leasing Act, 30 U.S.C.A. § 226-1.

6. See Holmberg, Historical Uncertainty of Federal Lease Titles, 10th Annual Rocky Mtn. Mineral Law Inst. 313, 336-38 (1965), in which the author cites excellent authorities to the effect that federal oil and gas lease records are often incomplete and confused and are not records of which others are charged with notice.

cants, the one prior in time should be given preference. It would be both illogical and impractical to suppose that the statute was intended to have any such arbitrary effect as to compel acceptance of an application to lease solely on the basis of priority of filing, especially where the rental offered is so greatly disparate from what could be obtained from the open market, as it was here. If it were so, the ability of the Board to manage such lands in the best interest of the State would be hampered greatly. Both the phraseology that the "applications shall be *considered* in the order filed" and the general purpose of the statutes suggest that the Board shall have some discretion in determining whether the lease should be granted or not.[7]

■ From the dispute that has arisen over the situation at hand, it is obvious that our statutes leave something to be desired as to certainty. Where such uncertainty exists the interpretation and application of statutes adopted by the administrative agency is usually looked upon with some indulgence.[8] It is both just and practical that the Board should be allowed considerable latitude of discretion in deciding what policies will best carry out the responsibilities imposed upon it.[9] Due to the considerations just stated, and because of its experience and presumed expert knowledge in its field, an administrative interpretation and application of a statute, although not necessarily controlling, is generally regarded as prima facie correct and not to be overturned so long as it is in conformity with the general objectives the agency is charged with carrying out, and there is a rational basis for it in the provisions of law.[10]

■ Finally, plaintiff advances an argument that inasmuch as his application was filed first, the Land Board is "estopped" from refusing him the lease because of the way it has handled similar cases in the past. Even under the facts as he asserts them to be, there could be no estoppel because the requisite elements are not present.[11] His contention rests upon his avouchment that in the past the Board has followed a policy of granting leases upon land after the expiration of federal leases on the basis of priority of filing, and with-

7. See *Lagoon Co. v. Utah State Fair Assn.,* 117 Utah 213, 214 P.2d 614 (1950); cf. *State By and Through Road Comm. v. Salt Lake City Public Bd. of Ed.,* 13 Utah 2d 56, 368 P.2d 468 (1961).
8. *Ogden Union Ry. & Depot Co. v. Utah State Tax Comm.,* 16 Utah 2d 255, 399 P.2d 145 (1965) (on rehearing).
9. See 4 Davis, Administrative Law Treatise, § 30.08 at 236.

10. See *McKnight v. State Land Board,* 14 Utah 2d 238, 381 P.2d 726, 731 (1963); 4 Davis, op. cit. supra note 5, at 213–14.
11. For elements of estoppel, see *Migliaccio v. Davis,* 120 Utah 1, 8, 232 P.2d 195, 198; as to whether the public agency may be estopped, see *Udall v. King,* 113 U.S.App.D.C. 397, 308 F.2d 650 (1962); cf. *Barash v. Seaton,* 103 U.S.App.D.C. 159, 256 F.2d 714 (1958).

out following the procedure requiring competitive bids. If this argument were sound, a wrong procedure once followed, would be very difficult to set right. Whether the Land Board may or may not have proceeded improperly in some cases in the past is not controlling as to the rights involved here. Fortunately, deviation from proper procedure in prior cases would not commit it irrevocably to continue doing so. And it certainly would give the plaintiff no right to compel persistence in such impropriety. The correct test to apply, and which we have concluded the Land Board has met, is whether in the instant case it acted within the authority conferred on it by law.[12] (All emphasis ours.)

The order of the Land Board is affirmed. No costs awarded.

McDONOUGH and WADE, JJ., concur.

CALLISTER, Justice (dissenting):

The majority opinion is correct in stating that the crucial question is whether the subject lands became available for leasing by the State *because* they were newly acquired. The majority holds that they were and, therefore, the Land Board properly denied plaintiff's application and followed the statutory competitive bidding procedure.

Considerable emphasis has been placed upon the words "become available for leasing" while the importance of the words "because they are newly acquired" have been minimized in the majority opinion. It states " * * * it appears to be intended that when mineral leasing rights are 'first available for leasing' they should be put on the open market and an opportunity for competitive bidding be given. * * * " This, evidently, without relation to when the lands are acquired by the State and under what circumstances.

The construction placed upon Section 65–1–45 completely emasculates its provision and provisions of related statutes regarding the priority of applications. The opinion further states that " * * * [i]t would be both illogical and impractical to suppose that the statute was intended to have any such arbitrary effect as to compel acceptance of an application to lease solely on the basis of priority of filing, especially where the rental offered is so greatly disparate from what could be obtained from the open market, as it was here. If it were so, the ability of the Board to manage such lands in the best interest of the State would be hampered greatly."

Unless I misinterpret the majority opinion, its effect would permit the Land Board

12. See Olson Constr. Co. v. State Tax Comm., 12 Utah 2d 42, 361 P.2d 1112, 1113 (1961); see also Utah Hotel Co. v. Industrial Comm., 107 Utah 24, 151 P. 2d 467, 153 A.L.R. 1176; cf. Moog Industries v. F. T. C., 355 U.S. 411, 413–414, 78 S.Ct. 377, 2 L.Ed.2d 370, see generally 1 Davis, op. cit. supra note 5, § 5.09.

to completely ignore priority of applications, and, in all instances, resort to competitive bidding. This is in direct conflict with the expressed intention of the legislature.

Prior to its amendment in 1959 [1] Section 65-1-45 read as follows:

Except as otherwise provided in this chapter, applications to lease shall be considered in the order filed; *provided,* that when simultaneous applications are filed the land board may, if deemed advisable by it, let the land to the person who will pay the highest rental therefor; *and provided further,* that applications to lease land already under lease shall not be received before sixty days prior to the expiration of said lease, and all such applications received within said sixty days shall be considered simultaneous.

Thus it is apparent that prior to 1959 the first qualified applicant was to be given preference in all instances with only one exception—where the filings were simultaneous as defined by the statute. In 1959 the legislature (undoubtedly prompted by the 1958 Dawson Acts) made two more exceptions: (1) Where lands become available for leasing *because* they are newly acquired and (2) where the lands become available for leasing *because* a previous mineral lease is canceled or otherwise terminated by the *Board* (not mentioning the United States).

It is true that the phrase "shall be considered" is somewhat nebulous. However, prior to 1959 it must be construed as mandatory rather than directory language. The word "shall" is ordinarily considered as mandatory and particularly when it is used in a statute which is addressed to public officials.[2] The two exceptions added by the 1959 Legislature do not make for naught the general provision relating to the preference to be given qualified applicants who are first in time. Exceptions extend only as far as their language fairly warrants, and all doubts should be resolved in favor of the general provision.[3] An exception to a general provision of a statute is indicative of a legislative intent that the thing excepted would be within the general provision had not the exception been made.[4] If the majority opinion is correct, insofar as it implies that the Land Board may exercise its discretion in all instances, the legislative enactment of the two exceptions was a needless gesture.

Further indication that the legislature intended that preference should be given to

1. Laws of Utah 1959, Ch. 132, § 1.
2. Smith v. Nebraska Liquor Control Comm., 152 Neb. 676, 42 N.W.2d 297; In re O'Rourke, 9 Misc. 564, 30 N.Y.S. 375; see also State v. Zeimer, 10 Utah 2d 45, 347 P.2d 1111, 79 A.L.R.2d 821 (1960).
3. 82 C.J.S. Statutes § 382, p. 892.
4. 82 C.J.S. Statutes § 382, p. 893; Broadbent v. Gibson, 105 Utah 53, 140 P.2d 939.

the first qualified applicant is found in the same 1959 Act which provided for the exceptions. This same Act amended Section 65–1–44 by inserting the following italicized words in a provision relating to appraisal of the rental value of lands to be leased for minerals: " * * * If the board deems it advisable to lease any land *for other than oil and gas,* it shall cause the same to be appraised and determine the annual rental thereon, * * *."

The same 1959 Act also contained what is now Section 65–1–88, the first part of which provides:

Except as otherwise provided by section 65–1–45, Utah Code Annotated 1953, as amended by this act, *oil and gas leases* in units not exceeding 640 acres or one section, whichever is larger, shall be issued to the applicant first applying for the lease who is qualified to hold a lease under this act. * * * (Emphasis added.)

The same 1959 Act also provided:[5] Yearly rental for state oil and gas leases shall be one dollar ($1.00) per acre or fraction thereof for each lease year. * * *

Also important is a 1963 legislative enactment again amending Section 65–1–45 [6] and which was in effect when the Land Board put up the subject lands for competitive bidding. This amendment added to the section the following provision:

(c) At the discretion of the land board, leases for minerals *other than oil and gas* may be offered at public auction upon such terms, conditions, and minimum bid as may be prescribed by the board. (Emphasis added.)

It is apparent from the foregoing that the legislature evidently has a different notion than the majority opinion as to how oil and gas leases should be leased to provide the State with the greatest benefit possible. If the legislature deemed it to be in the best interest of the State to have competitive bidding in all instances, it could very easily have so provided. Instead, over the years, it has seen fit to retain the priority mandate.

Mention is made in the majority opinion that the federal mineral leases of the subject land terminated July 27, 1962, but that the Land Board was not notified of this fact until March 27, 1963, after which it "carried forward with dispatch the procedure (competitive bidding) for leasing these lands." The opinion quotes with approval the conclusion of the Land Board that "the date upon which the Land Board first receives actual notice of the expiration or cancelation of a federal lease * * * is the date upon which the Land Board should assume jurisdiction and control over

---

5. 65–1–91, U.C.A.1953.

6. Laws of Utah 1963, Ch. 167, § 1. Effective date May 14, 1963.

the lands, and is the date upon which the lands which are newly acquired first be- come available for leasing." The opinion then states that, A realistic look at the sit- uation will reveal "that the date of 'actual notice' is the very first time the Land Board could do anything about leasing such land."

The foregoing is based upon fallacious reasoning as applied in the instant case where we are dealing with a situation where the lease was not canceled but ter- minated at the expiration of the term. In such a situation the federal government is not required to give any "actual notice" of the termination. As a matter of fact, the Dawson Acts[7] specifically provide that the patents issued to the State shall, if a lease is then outstanding, show the date when ti- tle vested in the State and the extent to which the lands are subject to prior condi- tions, limitations, easements, or rights, if any. It is provided that the State shall succeed to the position of the United States as lessor under such lease or leases. Cer- tainly, the Land Board has only to ex- amine a patent issued to the State and as- certain if there is a lease outstanding and, if so, should be able to ascertain from either the patent itself, or by routine inquiry, the term and conditions of the lease. Further- more, the State, having succeeded the United States as lessor, receives the rentals due under the lease and should be put on notice if they stop that the lease is either terminated or canceled. As an aside, it would seem that under the Dawson Acts the State, once a patent is issued to it, is the proper party to cancel a lease if there is a default in its terms.

In the instant case, the patent to the sub- ject lands was evidently issued in February, 1961. At that time, title in the fee vested in the State, and it had complete control and management over the lands, subject only to the terms of the outstanding lease. True, the Land Board could not lease the oil and gas rights while the federal lease was in force and effect, but the same is true if there were an outstanding State lease of State lands. It is hard to see the difference between a State lease and a federal lease where the State receives the fee title to the land and succeeds the Unit- ed States as lessor.

The subject lands cannot be considered as "newly acquired." The State held the fee title for over two years before the lands were put up for bid. The lands did not be- come available for leasing *because they were "newly acquired,"* but rather *because the lease expired.*

For the foregoing reasons, the decision of the Land Board should be reversed.

HENRIOD, Chief Justice (comment- ing):

7. 43 U.S.C.A. §§ 870 and 871a.

I do not participate in the outcome of this case, since I cannot determine the exact basis of the main opinion in the light of points made on appeal. If the opinion be predicated on the theory that the lands were "newly acquired" by "transfer of the mineral interests to the State of Utah by virtue of the expiration of the federal lease," [1] under 65–1–45, I think the opinion to be in error. Nothing was *transferred* to anyone by expiration of the lease. A barnacle simply was removed from the ship of reversion, which vessel always was there. There cannot be a transfer of a reversion by simple death of a lesser estate, and to attribute to the expiration of a lease the *transfer* of the fee or any part of it belies the concepts of tenure, which hardly could be said to have been changed by provisions of 65–1–45.

The main opinion seems to be somewhat inconsistent and discouraging to an applicant in urging at one point that the administrative agency's interpretation should be viewed with indulgence and its discretion recognized in carrying out its policies and responsibilities, which may have justified deviations in seven identical cases, but not in case of this eighth one which actually had priority of time over one of the others, but was processed later. The main opinion technically may be correct as to administrative construction, but if so, there would seem to be no justification for continued ap-proval of the other seven, although those matters are not before us.

The dissent of Mr. Justice CALLISTER appears to be more logical and reasonable in legislative construction than that of the main opinion. The latter would seem to penalize the poor prospector in favor of a richer nonprospector, who may not have been diligent in searching out natural resources at all, and seems to fly in the teeth of Archer v. Utah State Land Board, recently decided by this court and reported at 15 Utah 2d 321, 392 P.2d 622 (1964).

---

1. Conclusion of Law #3 of the Board.