## HUGHES *v.* DUNDEE MORTGAGE & TRUST INVESTMENT CO.

[Circuit Court, D. Oregon.   August 8, 1884.

**1. IMPLIED CONTRACT.**

Whenever one person does work or service for another with his consent, and there is no agreement as to compensation, the law implies a contract to pay what the same is reasonably worth; but when the circumstances of the case clearly repel the idea that the work or services were done with the expectation of payment being either made or received, no such contract will be implied.

**2. CASE IN JUDGMENT.**

The plaintiff acted as attorney for the defendant and amalgamated corporations engaged in loaning money in Oregon and Washington, under written instructions as to his duties and responsibilities.   It was his duty to examine titles to real property offered as security for loans, for which he was permitted to charge the borrowers specific fees.   He was also to aid and advise the corporations generally in all matters affecting their interests, but for this service no compensation was expressly provided.   The fees received from borrowers were no more than a reasonable compensation for the services rendered them.   Under these circumstances the plaintiff acted as the sole and general counsel and adviser of the corporations for some years, without making any charge or rendering any account of his services, or receiving any intimation from the corporations that they did not expect to pay him for them.   Upon being sued to recover the reasonable value of these services, the corporations claimed that it was "understood" that the plaintiff was to perform these services gratuitously, or in consideration of the fees received from borrowers.   *Held,* (1) that the mere understanding of either party to the contract was no part of it, and did not bind the other, and that there was nothing in the circumstances of the case, or the conduct of the parties, sufficient to prevent or repel the legal implication of a

promise by the corporations to pay the plaintiff what his services were reasonably worth; and (2) that the plaintiff, not having kept any account of his services, and being unable to prove any specific items, ought not to recover more than a reasonable annual retainer therefor.

Action to Recover Money for Legal Services.

*George H. Williams* and *Charles B. Bellinger*, for plaintiff.

*William H. Effinger*, for defendants.

DEADY, J. This cause comes before the court on exceptions by both parties to the report of the referee. It was commenced on February 12, 1883, to recover the sum of $21,255 for professional services as an attorney and counselor at law. It was tried by the referee upon an amended complaint, in which the sum demanded was reduced to $19,155, and an amended answer and the replication thereto. From these, it appears that prior to the commencement of this action the Oregon & Washington Trust Investment Company, the Oregon & Washington Mortgage Savings Bank, and the Dundee Mortgage & Trust Investment Company were each foreign corporations, formed under the laws of Great Britain, and engaged, among other things, in the business of loaning money in Oregon and Washington upon note and mortgage, with a principal office at Dundee, Scotland, and a common local office, board, and manager at Portland, Oregon; that the plaintiff was the attorney for these corporations in this country for the periods following: for the first one, from January 1, 1876, to January 1, 1880, when it was amalgamated with the latter; for the second one, from July 1, 1876, to July 17, 1881, when it was amalgamated with the latter; and for the latter, from January 1, 1880, to July 17, 1881; that by the terms of his employment the plaintiff was required to examine and pass on the title to any real property offered as security for a loan, and certify the result to the local manager, and to prepare and have properly executed and recorded all notes and mortgages taken by the corporations, for which service he was to receive a certain percentage on each loan, to be paid by the borrower; and generally to aid and advise in any matter of interest to the corporations. It is on account of services rendered under this latter provision that this action is brought, less the sum of $756.80 for fees earned in foreclosing two of said mortages for the defendant.

By the amalgamation of the two elder corporations with the defendant, it is admitted that it succeeded to their rights and assets, and became liable for any valid claim or indebtedness against either of them.

It is not alleged in the complaint that there was any express agreement to pay a fixed or any price for these general services, but only that they were rendered at the request of the corporations, and that their reasonable value is the sum sued for. In reply to a demand for a bill of particulars, the plaintiff filed a statement to the effect that he could not furnish an itemized account; that he was the gen-

eral attorney and counselor of these corporations during the period charged for, and the sole legal adviser of their local manager; that he was consulted almost daily by said manager on the business and affairs of the corporation, but made no current charge therefor, expecting to be paid a gross sum per annum, to be thereafter agreed on by the parties.

It is alleged in the answer that it was "understood and agreed" between the parties that the plaintiff was not to receive any compensation for his services from any of these corporations, but "was to render, without charge, such general advice as might be desired by either of said corporations," in consideration of the fees he received from borrowers. The answer admits the plaintiff's services in foreclosing the mortgages as alleged, and also the value of them, but avers that by special agreement they were to be paid out of the proceeds of the sale of the mortgaged premises, after the payment of the debt due the corporation, and that the defendant was obliged to bid in the property sold in said foreclosure suits for the amount of the decree, and is not able to sell the same; and therefore said fees are not yet due from the defendant.

The replication denies that it was "understood or agreed" that the plaintiff should furnish the general service he did for nothing, or on account of the fees received from borrowers; and admits the agreement stated in the answer as to the payment of the plaintiff's fees in foreclosure cases, but alleges that such agreement was made up.n the express condition that the plaintiff was to have the foreclosure of all the defendant's mortgages, which conditions the defendant has failed to keep; and denies that the defendant has not been able to sell said mortgaged premises. On July 17, 1881, a change was made in the mode of compensating the plaintiff, by which the defendant agreed to pay him for the examination of titles at the rate of $1\frac{3}{8}$ per centum on the amount of all loans, including loans renewed, and to allow him to charge borrowers with expense of travel incurred in such examination, whereby his receipts were materially increased, and in consideration of which he expressly undertook to give the defendant verbal advice about its affairs, without further charge. But the defendant soon became dissatisfied with this method of compensation, and the result was that, as the plaintiff would not perform the service on terms less favorable to himself, the relation terminated about the end of the year.

The facts about the foreclosure fees appear to be as stated in the replication, except that the defendant has not been able to sell the property, and the referee so found, and that the defendant is therefore now liable to the plaintiff for the amount of them.

Concerning the claim for compensation for general services, the only question arising on the pleadings is their value, and whether there was any agreement that they should be rendered gratuitously, or in consideration of the fees received from borrowers. Prior to De-

cember, 1875, when the plaintiff was appointed attorney for the Oregon & Washington Trust Investment Company, he was in partnership for a short time with Mr. A. C. Gibbs, the then attorney of said corporation, and was familiar with the fact that his fees for abstracts, searches, investigation of titles, preparing and recording mortgages, not exceeding a certain percentage on each loan, were to be paid by the borrowers, and that there was no express provision for his compensation by the corporation for any service he might render it directly. When the plaintiff became the attorney of said corporation he was furnished with the following schedule concerning his duties and responsibilities:

"(A) To prepare all mortgages, deeds, notes, coupons, and other documents in connection with the company's loans, and to be responsible for their due execution, publication, registration, and validity; (B) to be responsible that all mortgages taken are a clear and indisputable first lien upon the subjects mortgaged, and to grant certificates to that effect; (C) to take charge of and to conduct such proceedings as may from time to time be instituted by the company, or in which the company may be interested, subject to such instructions as may be issued thereanent; (D) to advise the local board and directors of any point of legal or other interest to the company which may be developed or come under his or their notice from time to time by legislative or judicial action, or otherwise; (E) and generally to give his best attention to all the matters connected with the legal department of the company's business, and to give such information and advice as may from time to time be requested or occur to him."

—And was advised that his compensation for services in connection with taking security for loans should be paid by the borrowers, as in the case of his predecessor.

On March 3, 1875, a scale of fees to be paid the attorney by borrowers was fixed in the Dundee office, in which the percentage allowed the attorney on eight classes of loans, ranging from $500 to $4,000, was from $2\frac{1}{4}$ to $1\frac{1}{8}$ per centum on the amount loaned, but all loans over the latter sum paid a uniform rate of 1 per centum. This was the rule when the plaintiff was employed, but the local manager claimed and had been privately permitted to take, from this allowance, one-half of 1 per centum to aid in compensating him for his services to the corporation. To this division of his fees the plaintiff soon demurred, on the ground that what was left for him was not an adequate compensation for the labor, expense, and responsibility involved in the service to borrowers, and after some correspondence with the Dundee office it was arranged that the plaintiff should receive the whole amount of the fees paid by borrowers for services in and about the applications for loans. The official resolution on the subject was passed on November 23, 1876, and is in these words:

"*Attorney.* That Mr. Hughes, the company's attorney, be remunerated by fees charged to borrowers in terms of scale of March, 1875, and now current. The directors trust that these rates of remuneration which, along with the relative appointment, are to continue during their pleasure, will be satisfactory to all concerned."

The referee found (1) that there was no express contract between the plaintiff and these corporations concerning compensation for his direct and general service to them, but that, during the time of his employment by them, the directors and local manager "understood and supposed" that the plaintiff was rendering said services "in consideration of the fees" paid him by borrowers, and the fees that might be received in foreclosure cases; and "that such was their contract with the plaintiff, and their dealings and communications with the plaintiff were sufficient to notify him that they so understood it from the inception of the employment;" (2) that prior to the termination of the employment the plaintiff made no charge or claim for such services; (3) "that the compensation received by the plaintiff in fees from borrowers was no more than a reasonable compensation for the services rendered in direct connection" with the application for loans; and (4) that the reasonable value of the general services rendered by the plaintiff to the defendant and amalgamated corporations, as provided in paragraphs 4 and 5 of the rules aforesaid, is the amount stated in the complaint.

The defense, that it was "agreed" between the parties that the plaintiff should perform the general service in consideration of the fees received from the borrowers for the particular service, is not sustained. The burden of proof in this respect is on the defendant, and it has utterly failed to prove any such agreement.

But it is also alleged in the answer that it was "understood," and the referee has found that the defendant and the amalgamated companies "understood," during the time these general services were being rendered, that they were performed gratuitously, or in consideration of the fees paid by borrowers. But the understanding a party may happen to have about any matter does not constitute a contract between him and another to that effect. To amount to a contract—*aggregatio mentium*—the understanding must be "mutual." But even a "mutual understanding" is not, strictly speaking, a contract, but rather indicates a common knowledge or apprehension of a contract or transaction. However, the term is sometimes used in this sense, in a loose way, to signify a contract. In *Livingston* v. *Ackeston*, 5 Cow. 531, cited by counsel for the defendant, SUTHERLAND, J., speaking for the court, says:

"No doubt the services of the plaintiff, having been performed for the benefit of the defendant, with his knowledge and approbation, the law will imply a promise to pay for them, unless it appears that they [the plaintiff and defendant] understood that no compensation was to be made."

Nor is it material if the plaintiff, as found by the referee, had reason to believe that the defendant understood that by the contract the plaintiff was to perform these general services without charge, so long, at least, as he did not, by sufficient word or deed, cause or authorize such understanding or conclusion. The finding is therefore immaterial, and judgment might be given, notwithstanding it, for the value of the services as found by the referee.

Upon the findings, then, taken according to their legal effect, these general services were furnished these corporations at their request and for their benefit without any express agreement as to the mode or measure of compensation therefor, and such, in my judgment, is the decided weight of the evidence. In such a case, the law, in the interest of justice and right, implies or supplies such a promise or agreement concerning the compensation as fair and honest men ought to have made. 3 Bl. 443; 1 Pars. Cont. 4; *Ogden* v. *Saunders,* 12 Wheat. 341.

Whenever one person does any work or service for another with his consent, and there is no agreement as to compensation, the law implies a contract, contemporaneous with the doing of the work or service, to pay what the same is reasonably worth; and the burden of proof is upon the party who, admitting the promise, denies the conclusion, or undertakes to avoid or prevent this implication by showing that the work or service was peformed gratuitously, or included in the compensation made for some other service or thing; as, for instance, that the party for whom the work or service is done declared at the time he would not pay for it. For the law will not imply a promise by a party, against his express declaration to the contrary, unless, as may happen, he is under a legal obligation to that effect, paramount to his own will. And such, and no more, is the doctrine of *Whiting* v. *Sullivan,* 7 Mass. 107, cited by counsel for defendant, in which it was held that the law would not imply a promise by the defendant to pay for the keeping of a horse, in the face of his express declaration to the plaintiff, at the time the horse was delivered to him, that he would not. The case of *Central Bridge Corp.* v. *Abbott,* 4 Cush. 473, is a good illustration of the exception to this rule, where the legal obligation of the party is paramount to his will. The defendant crossed the plaintiff's bridge, claiming that he was exempt from the payment of toll, and declaring that he would not pay any. But the court, having found that he was not exempt, held the law implied a promise on his part to pay the legal tolls, notwithstanding his declared intention to the contrary. The case of *St. Jude's Church* v. *Van Denberg,* 31 Mich. 287, also cited by counsel for defendant, stands upon another well-known exception to the rule. There a vestryman of the plaintiff in error, and an active member of the society, voluntarily acted as sexton for a time, and the court held that the law did not imply a contract to pay, because the circumstances clearly repelled the idea that the services were rendered or received with the expectation that payment therefor was to be made or claimed.

The contract which the law implies in any case "is co-ordinate and commensurate with duty," and never goes beyond the obligation supposed to be understood and acknowledged by all. 1 Pars. Cont. 4. Ordinarily, the law does not imply a contract to pay for services rendered by one member of a family to another, even by an adult child

to the parent with whom he lives, or by the officers of charitable or religious societies to the society, because it is not commonly understood or acknowledged that such services, in the absence of express contract to that effect, are either rendered or received with the expectation of payment therefor being either made or claimed. An implied contract grows out of the acts of the parties, and never includes any stipulation or provision but such as ought, under the circumstances, to have been made. *Ogden* v. *Saunders, supra.*

In this case the contract between the parties is contained in the document defining the plaintiff's duties, and delivered to him on his appointment. This instrument was prepared by the corporation, and whatever of omission or uncertainty there is about it must be taken most strongly against the defendant. If it was intended or expected that the general service to the corporation should be compensated for by the fees received from borrowers, it was a simple and natural thing to have said so, unless it was apprehended that such an arrangement would make the loans usurious and void. And if it was thought lawful and desirable to exact from the plaintiff the gratuitous performance of these services as a condition or in consideration of giving him the opportunity to earn the fees from borrowers, why was it not mentioned? The instrument is evidently prepared with skill and care, and while it expressly and minutely provides for the attorney's "fees against borrowers," it is silent as to the compensation for the wide field of general service required to be performed by him for the corporation.

But significance is sought to be given to the word "remunerated," in the resolution of November 23, 1876, in this connection, and it is seriously contended that this resolution proves that the contract was that the "fees charged to borrowers" were to *remunerate* the plaintiff for his services to the corporation, as well as the borrowers. Abstracted from its surroundings, and read without reference to the circumstances that led to its adoption, it may be admitted that this resolution is susceptible of this construction; but when it is considered that it would make the loans of the corporation liable to be pronounced usurious, it ought not to be adopted unless for peremptory reasons. But when it is also remembered that this resolution is simply the result of a negotiation or correspondence between the plaintiff and the corporation, in which the former reasonably and justly claimed that he ought not to be required to divide his fees from borrowers with the local manager of the latter, but that he ought to be allowed to retain the whole of them, according to the terms of his appointment, and for the further reason that they were not a lucrative compensation for the services at best, there is no ground whatever for such construction.

Let us next consider what, if anything, there is in the circumstances of the case and the conduct of the parties to the contract to repel the conclusion, and prevent the implication that the general service was

performed and received with the expectation that it would be paid for according to its value, in addition to the fees received from borrowers. If the fees received from borrowers were very lucrative, and much beyond the real value of the services rendered to them, this would be a fact, more or less material, according to the circumstances, tending to show that they were really intended and understood by the parties as a compensation for general services as well. And however immoral or unjust such a transaction might be considered, as against the borrowers, probably the plaintiff ought not to be heard to impugn it. If these general services were also of a trivial or mere routine character, and comparatively of infrequent occurrence, this would enhance the probability that they were covered by the fees allowed to be taken from the borrowers. But the exact contrary is the fact, so far, at least, as the fees to borrowers are concerned. During the first year the Oregon & Washington Trust Investment Company, according to the testimony of the local manager, loaned about $300,000, and one year its loans reached about $500,000. The defendant's loans did not exceed $100,000, but it was also doing a savings bank business, and purchased state and county warrants. First and last these corporations have loaned in Oregon and Washington about four millions, and had out therein, at one time, as much as $1,700,000. During this period they declared annual dividends of from 6 to 10 per centum on their capital stock, and made from 10 to 21 per centum of profits thereon. The plaintiff's compensation for preparing or procuring abstracts, examining titles, making notes and mortgages, and procuring them to be recorded, in connection with these loans, varying in amount from $500 upwards, was less than an average of $1\frac{1}{2}$ per centum on the amount loaned. And, in addition to the ordinary responsibility of an attorney, he absolutely guarantied that in each case the title was good and the corporation got a first lien. During this period of nearly six years his gross income from this source did not reach $30,000, and the expenses of the business were quite half of that. The plaintiff has exhibited a detailed statement of the loans made and the fees received by him during the last year of his employment, which he says was the best one. The amount loaned is $607,200, divided among 326 loans, and his percentage is $6,925.55, or 1.14 per centum of that amount. There is nothing in these facts calculated in the least degree to repel the implication that the corporation promises to pay the plaintiff specifically for his general services to them whatever they were worth. The compensation received from the borrowers, so far from being lucrative, was very moderate. I am quite certain that the ordinary charge for this service by a reputable attorney, without even the special guaranty, would have been not less than 2 per centum.

But it must be admitted that the conduct of the parties concerning the compensation of these general services is not distinguished for openness or candor. For nearly six years the corporations demanded

and received these services, and the plaintiff furnished them, without a word or intimation on either side that they were or were not to be paid for.   And the plaintiff now frankly admits that while he always intended to claim a specific compensation for these services, he did not do so while the employment lasted, for fear he would have trouble with the corporations, about the amount of it, at least, and probably lose their business; and that in the absence of express provision in the contract concerning such compensation, he had a right to rely upon the promise to pay which the law would imply, and to claim the benefit of it whenever it best suited his interest or convenience, and within such time as the law would permit.   But his conduct in this particular is more than balanced by that of the corporations. From time to time they requested and received these services from the plaintiff, well knowing that they had made no express provision concerning his compensation therefor, and never intimated to him that they did not intend to pay for them, or that they should claim that he ought to furnish them gratuitously, in consideration of the fees he was allowed to take from borrowers.   There is nothing, then, in the circumstances of the case, or the conduct of the parties while act-ing under the contract, that will repel or prevent the convenient and just implication by the law of a promise by the corporations to pay the reasonable value of these services.   They were furnished at their request, and received without any indication that they did not intend to pay for them.   The fees received from the borrowers were but a moderate compensation for the services rendered them, and it is not reasonable to suppose that they were taken and received by the plain-tiff in satisfaction of the services rendered the corporations also.

The referee has found that these services are reasonably worth the sum stated in the complaint.   But I cannot agree with this conclu-sion for several reasons.   The plaintiff kept no account of these serv-ices, and is therefore unable to give a detailed statement of them. The burden of proof is on him to show in what the services consisted, and their value.   They may have been worth $2,500 a year, but the court cannot assume that they were without the direct proof of one specific item.   The failure to keep an account of these services is the fault of the plaintiff, and he must suffer for it, if any one.   From the evidence it may be inferred that the plaintiff was freely plied with verbal and perhaps trivial questions by the local manager; but he does not appear to have draughted any agreements or furnished any written opinion.   It also appears that at some time he was consulted about some scheme to escape local taxation; that he went before the county court to get the defendant's assessment changed or reduced; and that he attended the biennial sessions of the legislature when the corporations were threatened with hostile legislation.   But no spe-cific service of even this kind is mentioned or shown.   Under the circumstances, the only measure of compensation which I think can be safely adopted, is to allow the plaintiff an annual sum as a re-

tainer.   And, in so doing, I must consider these three corporations as constituting one continuous client from January 1, 1876, to July 17, 1881, which, for convenience, may be considered five years and seven and a half months.   And in fact this is the way the plaintiff treated them, and he so testified.   This retainer, in my judgment, should not exceed $1,200 a year, or $6,750 for the whole period. Add to this the two foreclosure fees of $756.80, and we have the sum of $7,506.80, which the plaintiff is entitled to recover, with legal interest—$900.81—from the commencement of the action, or the period of one year and six months, making in all the sum of $8,407.61.

The findings of the referee are set aside, and findings by the court in accordance with this opinion will be filed in their stead.