**Lowell THOMPSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 17180.**

United States Court of Appeals Ninth Circuit.

Sept. 25, 1962.

**630**

Wellman Clark, Spokane, Wash., H. J. Hull & Sons, H. J. Hull, Piatt Hull, and Alden Hull, Wallace, Idaho, for appellant.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, and Elizabeth Dudley, Attys., Dept. of Justice, Washington, D. C., and Kenneth G. Bergquist, U. S. Atty., Boise, Idaho, for appellee.

Before ORR and MERRILL, Circuit Judges, and KILKENNY, District Judge.

KILKENNY, District Judge.

By this action the United States seeks to quiet title to certain lands in Idaho, to restrain and enjoin appellant from using the premises and to recover damages for minerals taken and used by appellant during the course of his occupancy.

Milwaukee Land Company was the owner of approximately 25,000 acres of real property in Shoshone, Clearwater, Latah and Benewah Counties, Idaho. Prior to August, 1933, the Land Company conveyed said property to one Dickie, reserving its rights to oils, gases, coals, ores, minerals and fossils in the land. In said month, Dickie conveyed all of his interest in said land to the United States, "to encourage the practice of forestry for the benefit of the people of the United States." In December, 1937, the Land Company conveyed its reserved interests in the property to the United States, the deed specifying that the conveyance was made pursuant to the provisions of Section 7 of the Act of June 7, 1924, 43 Stat. 654, 16 U.S.C.A. § 569,[1] and the Act of March 3, 1925, 43 Stat. 1133, 16 U.S.C.A. § 555. The former conveyance was accepted by the Secretary of Agriculture on August 8, 1935, as a donation under said Section 7. The Department of Agriculture, in October, 1942, issued a permit to appellant's predecessor to mine and remove minerals from a part of the above mentioned tract of land. This permit was assigned to appellant in January, 1953, with the approval of the Bureau of Land Management. At the request of appellant, this permit was terminated in September, 1955. Appellant, in November, 1954, after receiving the advice of an attorney, located mining claims on the property in question. After making such locations, appellant and his attorney corresponded with officials of the United States in connection with the validity of the claims. The United States took the position that the lands in question were not subject to entry and location under the general mining laws and demanded that appellant discontinue his trespass on said lands. This action is the result of appellant's refusal to comply with such demands.

The district court held that the lands in question were not open to mineral location and that appellant knowingly and

1. Section 7 of the Act of June 7, 1924 provides:

"To enable owners of lands chiefly valuable for the growing of timber crops to donate or devise such lands to the United States in order to assure future timber supplies for the agricultural and other industries of the State or for other national forest purposes, the Secretary of Agriculture is hereby authorized, in his discretion, to accept on behalf of the United States title to any such land so donated or devised, subject to such reservations by the donor of the present stand of merchantable timber or of mineral or other rights for a period not exceeding twenty years as the Secretary of Agriculture may find to be reasonable and not detrimental to the purposes of this section, * * *. Any lands to which title is so accepted shall be in units of such size or so located as to be capable of economical administration as national forests either separately or jointly with other lands acquired under this section, or jointly with an existing national forest. All lands to which title is accepted under this section shall, upon acceptance of title, become national forest lands, subject to all laws applicable to lands acquired under the Act of March 1, 1911 (Thirty-sixth Statutes at Large, page 961), and amendments thereto. * * *"

intentionally trespassed on the property and removed minerals of a value of $305,810.54, on which he made, after the deduction of the costs and expenses of extraction, a profit of $110,766.64. The court further found that the appellant damaged the property in the sum of $4,792.66 and owed rental under the former lease in the sum of $311.95. Against the total of these sums, the court allowed an offset of $42,670.22 for minerals mined but not sold, to which the United States had title and was entitled to possession, and held that the United States was entitled to judgment against appellant for $73,201.63.

Appellant assigns error as follows:

I. The lower court erred in holding that the lands in question were not open to mineral location.

II. That the lower court adopted an erroneous measure of damage.

III. That appellant should have been allowed the reasonable value of his personal services in removing the minerals.

IV. That the lower court erred in failing to consider the effect of the judgment on appellant's income tax problems.

██ I. Appellant contends that the lands in question are public lands and that his mineral entries were made pursuant to the Act of February 25, 1920, 30 U.S.C.A. § 22.[2] He argues that the area is subject to the National Forest Act of March 3, 1891, Title 16 U.S.C.A. § 471 et seq. and that Section 478[3] specifically authorizes the location of mineral claims on forest lands. 16 U.S.C.A. § 475, enacted in 1897, limited the effect of the National Forest Act to "public lands." The lower court found, and we believe the evidence sustains such finding, that the conveyance from Dickie to the United States was a donation and was made pursuant to the provisions of

16 U.S.C.A. § 569, rather than 16 U.S.C.A. § 555. The court will take judicial notice of the fact that such a large body of land would not and could not be acquired for the limited purposes mentioned in Section 555, i. e., National Forest headquarters, Ranger Stations, dwellings or other sites required for effective conduct of the activities of the Forest Service. For that matter, it may have been the intention of the Secretary to accept the donation and devote a very limited portion of the area to the purposes mentioned in Section 555 and the remainder of the area to the purposes mentioned in Section 569. Both conveyances could have been accepted as donations without doing violence to our ultimate conclusions.

██ Throughout his argument, the appellant urges that the lands in question are "public lands" within the meaning of the Forest Service Act and for that reason the area is subject to mineral entry. He cites many cases involving general principles and makes reference to numerous statutes. Appellant's difficulty is that he fails to recognize the distinction between "public land" and "acquired land." Each was defined with commendable clarity in Barash v. Seaton, 1958, 103 U.S.App.D.C. 159, 256 F.2d 714, 715, as follows: "Acquired land is Government owned land acquired from private ownership. Public land is Government owned land which was part of the original public domain." These definitions are quoted with approval in Murray v. United States, 8 Cir., 1961, 291 F.2d 161. Since the lands in question were not public lands within the meaning of the phrase as used in the National Forest Act, and since the lands in question were acquired by the United States for a specific purpose, our decision is controlled by the opinion of the United

---

2. "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States * * *."

4. " * * * nor shall anything herein prohibit any person from entering upon such national forest for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. * * * "

States Supreme Court in Oklahoma v. Texas, 1922, 258 U.S. 574, 599, 600, 42 S. Ct. 406, 66 L.Ed. 771, and the opinion of this circuit in Rawson v. United States, 9 Cir., 1955, 225 F.2d 855, cert. den. 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. 816. While it is true that the lands acquired in Rawson were acquired under another statute for another type of project, the general principles involved in that case are identical with those here in question. In Rawson, this court held that there was no authority for a mineral location on lands which had been acquired by the United States for use in connection with an emergency relief project and in so holding, held that Title 30 U.S.C.A. § 22 must be read in the light of the entire enactment of which it was but a part, and that when so read, the section embraces land owned by the United States, *but not all lands so owned.* It is there held that it was only where the United States had indicated that the lands are held for disposal under the general land laws that a mineral location might be filed. The Dickie land was acquired and held, not for sale, but for the specific purposes mentioned under the donation laws.

Aside from the logic of applying the decisions in Rawson and Oklahoma v. Texas to the facts in this case, we conclude that a proper construction of the statutes points to the same result. A study of the applicable legislation leads us to the conclusion that, from a standpoint of status and origin, lands which are subject to administration by the Forest Service within National Forests should be classified, for most purposes, in two groups: (1) that group reserved from the public domain for National Forest purposes or acquired through exchange for such reserved land or timber; and (2) that group re-acquired by the United States from private, state or local government ownership through purchase, exchange, donation or settlement. A large area of the lands in group (2) was acquired under the authority of the Weeks Act of March 1, 1911 (36 Stat. 961), as amended, 16 U.S.C.A. §§ 480, 500, 513–519, 521, 552, 563, which provides for the purchase of lands to promote the production of timber or regulation of stream flow. The lands acquired by this Act are subject to specific laws authorizing exchange, classification of small tracts of agricultural land, development of mineral resources, and are specifically reserved as National Forest lands. Located within the boundaries of the National Forest is a substantial area acquired under statutes other than the Weeks Act or acquired in exchange for reserved public domain land. This is the type of land with which we are here concerned. As late as April 23, 1958, the Secretary of Agriculture and the House Committee on Agriculture were of the view that lands acquired under the procedures herein followed were not subject to mineral development, except through proper leases.[4] It is obvious that the title to the lands in question was placed in the United States for the specific purpose of preserving the timber and that the recognition of a mining location pursuant to 30 U.S.C.A. § 22 would be wholly inconsistent with the purpose of the acquisition. Section 7 of the Act of June 7, 1924, supra, provided that lands acquired pursuant thereto would be subject to all laws applicable to lands acquired under the Act of March 1, 1911, which is commonly known as the Weeks Act, 36 Stat. 961. The Weeks Act declared its primary purpose to be the protection of watersheds of navigable streams and authority was given to acquire lands for such purpose. Under the Weeks Act it was the Secretary of Agriculture, not the Secretary of the Interior, who was authorized to permit the prospecting, development and utilization of the mineral resources in acquired lands. It was not until the 1947 Reorganization Plan that the Secretary of the Interior received authority to grant mineral leases in acquired lands. 30 U.S.C.A. §§ 351, 352. At the time of the passage of the Weeks Act, at the time of the adoption of 16 U.S.C.A. § 564 on June 7, 1924, and at the time of acceptance of the do-

4. Report No. 2638, 85th Congress, 2nd Sess.

nation deeds, the Secretary of Agriculture had absolute control of lands acquired for forest conservation purposes. Public lands, as distinguished from acquired lands, have always been administered by the Department of the Interior. As stated in Rawson, the action of Congress in placing these lands under the jurisdiction of the Department of Agriculture is rather conclusive proof that it did not intend such lands to be subject to the general land or mining laws. The fact that this jurisdiction was later transferred to the Department of the Interior under the provisions of the Reorganization Act is of no significance. The intention of Congress at the time of the passage of the Act is the governing factor.

■ There is nothing in the Weeks Act which would permit the location of mineral claims on lands acquired under its provisions. By the Act of August 11, 1916, 39 Stat. 446, 462 (re-enacted March 4, 1917, 39 Stat. 1134, 1150; 16 U.S.C.A. § 520), the Secretary of Agriculture was authorized to issue a permit for prospecting, development and utilization of mineral resources on lands acquired under the Weeks Act. It was pursuant to this authority that appellant was leasing the lands in question prior to his decision to file a mining claim on such lands. Appellant urges that the United States could not have acquired title to the land under the authority of 16 U.S.C.A. § 569, because the mineral rights had been reserved by the Milwaukee Land Company for more than 20 years. There is here no evidence of such a reservation. Assuming, *arguendo*, that there was such a reservation, the language of the Act is confined to the "donor." It would seem that Dickie, rather than the Land Company, was the donor and it is obvious that he made no such reservation. Certainly, there is a distinction between a conveyance of a parcel of land subject to a mineral reservation and one where there is a reservation by the donor of mineral rights. In the latter, the 20-year provision would be applicable, while in the former, such provision would have no application. Appellant entirely overlooks the doctrine of merger when he urges us to consider the deed from the Land Company separate and apart from the Dickie donation deed. The complete title merged and became vested in the United States on the acceptance of the Land Company deed.

■ II. Under the trial court's finding that appellant "knowingly and intentionally" removed the minerals, the court's decision to offset the cost and expense of the extraction of the minerals is questionable. However, the Government did not appeal and the measure of damages adopted by the court finds some support in United States v. Wyoming, 331 U.S. 440, 458, 67 S.Ct. 1319, 91 L.Ed. 1590. In any event, the appellant cannot complain. The award of damages is as favorable as he could expect. Cases such as United States v. St. Anthony Railroad Company, 192 U.S. 524, 24 S.Ct. 333, 48 L.Ed. 548, are not in point. The factual background in those cases does not, as here, reveal a continuing trespass after notice to desist. The measure of damages adopted by the trial court should not be disturbed.

■■ III. The cases cited by appellant do not support his argument that he should be entitled to offset against the judgment the reasonable value of his personal services rendered in connection with the extraction of the minerals. We find no case, and appellant has cited none, which permits a recovery on *quantum meruit* where the person performing the service did so against the wishes of the person against whom the claim was made. By permitting such a recovery, the court would be placing a premium on the commission of a wrongful act and would thus encourage, rather than discourage, similar transgressions. When the circumstances of a case clearly repel the idea that the services were performed with the expectation of payment being either made or received, a promise to pay will not be implied and the common law action will not lie. Hughes v. Dundee Mortgage & Trust Investment Co., C.C., Or., 21 F. 169, aff'd

**634**

124 U.S. 157, 8 S.Ct. 377, 31 L.Ed. 357; United States v. Pacific Railroad, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099.

■ IV. Appellant cannot settle or dispose of his income tax problems in this litigation. The Internal Revenue Act provides for complete and exclusive relief to taxpayers who feel aggrieved by the rulings of the Commissioner. Thus, it is clear that Congress has provided two, and only two, basic procedures by which a taxpayer may challenge the legality of a tax or an assessment: (1) he may decline to pay and, provided the proper steps are taken, he may have a determination of his problem before collection and payment of the tax. 26 U.S.C. § 6213. This is commonly known as the Tax Court route, the decision in which may be reviewed on the record before the Court of Appeals; or (2) the taxpayer may pay the disputed tax and after exhausting the procedures on his claim for refund, he may sue in the United States District Court to recover the taxes paid. 26 U.S.C. § 7422. Carter v. Campbell, 5 Cir., 1959, 264 F.2d 930.

This court has no primary jurisdiction unless it is alleged that the tax was erroneously or illegally *assessed or collected*. 28 U.S.C. § 1346(a) (1). No such contention is made by appellant. Furthermore, no suit may be maintained in this court for repayment of a tax actually paid until a claim for refund has been duly filed in accordance with law. 26 U.S.C. § 7422. Again, no such contention is made by appellant. The filing of a claim for refund is a condition precedent to the maintenance of the action. United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025; England v. United States, 7 Cir., 1958, 261 F.2d 455. This contention is without merit.

The findings of the trial court are supported by substantial evidence and the record reveals no prejudicial error.

The judgment of the lower court is affirmed.