Tom BROWN, Appellant,

v.

UNITED STATES DEPARTMENT OF INTERIOR, Appellee.

No. 81–2064.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1982.

Decided June 3, 1982.

Donald J. Adams, Adams, Covington & Younes, P. A., Harrison, Ark., for Tom Brown.

Carol E. Dinkins, Asst. Atty. Gen., Washington, D. C., Larry R. McCord, U. S. Atty., J. Michael Fitzhugh, Asst. U. S. Atty., Fort Smith, Ark., Robert L. Klarquist, Albert M. Ferlo, Jr., Attys., Dept. of Justice, Washington, D. C., for appellee.

Before HEANEY, BRIGHT and HENLEY, Circuit Judges.

HEANEY, Circuit Judge.

Tom Brown appeals from an order of the district court dismissing with prejudice his complaint for review of a decision by the Interior Board of Land Appeals (IBLA). The IBLA held that Brown's 101 mining claims located on federally owned land are void. We affirm.

The appellant's mining claims were filed with the Circuit Clerk of Marion County, Arkansas, in April, May and June of 1976 by Mike Cozad. Cozad conveyed his interest in the claims to the appellant on July 6, 1976. The lands subject to the claims had earlier been acquired by the United States as part of the Buffalo National River (hereinafter the "River"), established March 1, 1972, by Pub.L. 92–237, 86 Stat. 45, 16 U.S.C. § 460m–8 et seq. (1976).

On April 14, 1978, the Eastern States Office of the Bureau of Land Management informed Brown that the claims were null and void. Brown appealed that decision to the IBLA, which affirmed the decision of the Eastern States Office on two grounds: (1) that the River was made part of the National Park System by virtue of 16 U.S.C. § 460m–12, and areas within the System are not open to mining claims unless specifically authorized by Congress; and (2) that the River lands are lands acquired by the United States for a specific use and, as such, are not open for location of mining claims absent specific legislative authority.

Brown filed a complaint for review in the district court. The district court dismissed Brown's claims on the basis of the test suggested in Rawls v. United States, 566 F.2d 1373 (9th Cir. 1978), which holds exempt from mining claims lands "acquired for a specific purpose that would be frustrated by their being subject to mineral claims." Id. at 1376–1377. See Rawson v. United States, 225 F.2d 855 (9th Cir. 1955), cert. denied, 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. 816 (1956). The Court found that although the River "was not a national park or monument," the areas involved were acquired by Congress for purposes that would be frustrated by their being subject to mineral claims. Brown v. Department of Interior, No. 80–3046, slip op. at 4–6 (W.D.Ark. September 17, 1981). This appeal followed.

## SCOPE OF REVIEW

On appeal from the district court, the appellate court "must render an independent decision on the basis of the same

administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference." *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1374 (8th Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). The standard of review is that set out in the Administrative Procedure Act, 5 U.S.C. § 706:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \*    \*    \*    \*    \*    \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]

█ The facts in this case are uncontroverted. Thus the issues posed to us are strictly legal ones. We must determine, by interpreting the relevant statutes, whether mining claims are allowable on the River. In this situation, we determine the questions of law de novo, *First National Bank in Sioux City v. Nat. Bank of South Dakota*, 667 F.2d 708, 711 (8th Cir. 1981), giving deference to the agency's interpretation of the law which it is charged with administering. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Murphy Oil Corp. v. FERC*, 589 F.2d 944, 948 (8th Cir. 1978). Nonetheless, the standards of 5 U.S.C. § 706, *supra*, require us to engage in a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). With these considerations in mind, we turn to the merits.

## NATIONAL PARK SYSTEM STATUS

█ Brown maintains that the district court's statement that the River is not a national park or monument invalidated the IBLA's finding that the lands in question were part of the National Park System. We do not agree. The Department of Interior is required by 16 U.S.C. § 406m–12 to "administer, protect and develop" the River under the National Park Service in accordance with 16 U.S.C. §§ 1 and 2 to 4. The latter act governs the administration of the National Park System and defines the System as including "any area of land and water now or hereafter administered by the Secretary of the Interior through the National Park Service for park, monument, historic, parkway, recreational, or other purposes." 16 U.S.C. § 1c(a) (1976). Although the River is neither a national park or monument, it is clear from the purposes for which it was established that the River fits the above definition.

Congress established the River in 1972 "[f]or the purposes of conserving and interpreting an area containing unique scenic and scientific features, and preserving as a free-flowing stream an important segment of the [River] for the benefit and enjoyment of present and future generations \* \* \*." 16 U.S.C. § 460m–8 (1976). The legislative history of the Act indicates that one of Congress's primary purposes in creating the River was to preserve its undeveloped, pristine character:

> With little residential or commercial development on its banks, and with no municipal or industrial pollution, the Buffalo River is unspoiled. It provides a unique opportunity for preservation since its headwaters lie within the Ozark National Forest, and the remaining 132 miles of the river can be preserved and administered as a single unit.
>
> Hillsides and bluffs provide a variety of conditions for some 1,500 species of plants, while the Buffalo River and its tributaries are one of the richest waterways in the Nation in terms of the total number of fish species.
>
> Within the proposed national river are a 200-foot waterfall in Hemmed-in Hollow, the highest free-leaping waterfall between the southern Appalachians and

the Rockies; a collection of outstanding gypsum formations in Beauty Cave; and a number of archeological sites. These sites can yield the story of Indian occupation from archaic to late prehistoric times—a span of some 9,000 years.

S.Rep.No.92–130, 92d Cong., 2d Sess. 1, *reprinted in* 1972 U.S.Code Cong. & Ad.News 1969.

The history also stresses the River's viability as a recreational area:

Recreational uses within the proposed Buffalo National River include boating, fishing, swimming, camping, photography, nature observation, and hunting.

The old trails and wagon roads which wind along the river, parallel the tributaries and traverse the ridges, provide a good basis for developing a system of hiking and riding paths. Two rugged and virtually uninhabited expanses of country, one at each end of this area, will provide unusual primitive environments where a rider, canoeist, trail camper, and scientist may find enjoyment.

*Id.*, 1972 U.S.Code Cong. & Ad.News at 1970.

In furtherance of these purposes, Congress provided for the acquisition of lands and waters, 16 U.S.C. § 460m–9, authorized the promulgation of hunting and fishing regulations, 16 U.S.C. § 460m–10, and restricted the use of the River for water resource projects, 16 U.S.C. § 460m–11.

It is apparent that it was the intent of Congress to take over the River for conservation, historical and recreational purposes. Thus, the River clearly is an area of the National Park System as defined by 16 U.S.C. § 1c(a).

The appellant has correctly pointed out that there is no specific language in the River's establishing act, 16 U.S.C. § 460m–8 *et seq.*, that withdraws its lands from the purview of the Mining Claims Act of 1872. The Mining Claims Act of 1872, 30 U.S.C. § 22 (1976), states that "[e]xcept as otherwise provided, all valuable mineral deposits in lands belonging to the United States * * shall be free and open to exploration and purchase * * *." On its face, that act

would appear to allow Brown's claims unless congressional intent to the contrary is found. The Supreme Court, however, has indicated that

[t]his section is not as comprehensive as its words, separately considered, suggest. * * * [I]t is apparent that, while embracing only lands owned by the United States, it does not embrace all that are so owned. * * * *Only where the United States has indicated that the lands are held for disposal under the land laws does the section apply; and it never applies where the United States directs that the disposal be only under other laws.*

*Oklahoma v. Texas*, 258 U.S. 574, 599–600, 42 S.Ct. 406, 415–416, 66 L.Ed. 771 (1921) (emphasis added). *See Thompson v. United States*, 308 F.2d 628, 632 (9th Cir. 1962); *Rawson v. United States, supra*, 225 F.2d at 856–857.

An examination of various statutes reveals that when Congress has desired to make lands within an area of the National Park System open to mineral entry, the establishing act specifically so states. *See* 16 U.S.C. § 94 (1976) (Mount Rainier National Park); 16 U.S.C. § 127 (1976) (Crater Lake National Park); 16 U.S.C. § 252 (1976) (Olympic National Park); and 16 U.S.C. § 350a (repealed 1976) (Mount McKinley National Park). In addition, mining in four national monuments has been allowed only through specific act of Congress. *See* 16 U.S.C. § 450y–2(b) (amended 1976) (Coronado National Memorial); 16 U.S.C. § 447 (repealed 1976) (Death Valley); 16 U.S.C. § 450z (repealed 1976) (Organ Pipe Cactus National Monument); Act of June 22, 1936, 49 Stat. 1817 (Glacier Bay National Monument).

Furthermore, as the IBLA decision notes, the legislative history of the Mining Activities within the National Park Systems Areas Act, 16 U.S.C. § 1901 *et seq.*, provides ample support for the proposition that areas of the National Park System are not open for mining claims unless the statute creating the area specifically makes the lands subject to the mining laws. That Act repealed the provisions of six organic acts

allowing mining claims in National Park System areas.

The House Report accompanying the Act noted that "of the more than 100 new units which have been added to the National Park System over the past two decades, not a single such area has been established subject to mineral entry." H.Rep.No.94–1428, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Ad.News 2487, 2493. The Report also stated that

> [a]long with other resource uses such as water development projects, timber harvesting, and agricultural production, mineral extraction is generally precluded within our National Parks. Yet the Mining Law of 1872 still applies to six of the approximately 300 units of the system. Crater Lake and Mount McKinley National Parks; Death Valley, Glacier Bay and Organ Pipe Cactus National Monuments; and Coronado National Memorial are all still subject to mineral exploration and development.

> These six areas were classified as open to mineral entry by specific legislation, generally at the time they were first authorized.

*Id.*, 1976 U.S.Code Cong. & Ad.News at 2489.

Accordingly, because the River has been made part of the National Park System and not specifically opened to mineral entry by its establishing act, Congress considered the River as part of a class of lands closed to mining and mining claims.

### NATIONAL WILDERNESS STATUS

■ Brown also argues that the Buffalo River is subject to mining claims because the act establishing the project required that the River be reviewed for suitability as a national wilderness area. *See* 16 U.S.C. § 460m–13. Brown reasons that because a section of the Wilderness Act of 1964 withdraws certain "wilderness areas" from mineral exploitation as of December 31, 1983, claims may be asserted in wilderness areas before that date. *See* 16 U.S.C. § 1133(d)(3) (1976). A careful reading of 16 U.S.C. § 1131(d)(3) reveals, however, that it

applies only to mining activities within *national forest lands* designated as wilderness. As the district court correctly noted, "the Wilderness Act did not open areas for mineral entry; it merely preserved the right to mineral entry in those national forest lands administered by the Secretary of Agriculture, the right to mineral entry in national forests having been created by act of Congress, 16 U.S.C. § 478." *Brown v. Department of Interior, supra,* slip op. at 5. This provision of the Wilderness Act is not applicable to lands such as the River which are not national forest lands and the Act, therefore, can provide no support for Brown's claim.

In conclusion, we hold that the IBLA correctly found that Brown's claims on lands within the Buffalo National River were invalid because the act establishing the River as a part of the National Park System implicitly withdrew the lands in question from mineral entry and location. We therefore need not reach the alternative ground relied on by the district court, and do not decide whether the River is land "acquired by the United States for a specific purpose" exempting it from mining claims.

Affirmed.